In re LANDMARK HOTEL & CASINO, INC., a Nevada corporation, d/b/a Landmark Hotel & Casino, Debtor (Two Cases).

LANDMARK HOTEL & CASINO, INC., a Nevada corporation, d/b/a Landmark Hotel & Casino, Appellant,

v.

LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS, Culinary Workers Union, Local No. 226, and Bartenders Union, Local No. 165; International Brotherhood of Electrical Workers, Local No. 357; International Union of Operating Engineers, Local No. 501; International Brotherhood of Painters & Allied Trades Local No. 159; Professional, Clerical and Miscellaneous Employees, Local No. 995 (Front and Back End Agreements); United Brotherhood of Carpenters and Joiners of America, Local No. 1780, Appellees.

LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS, Cross-Appellant,

v.

LANDMARK HOTEL & CASINO, INC., a Nevada corporation, d/b/a Landmark Hotel & Casino, Cross-Appellee.

LANDMARK HOTEL & CASINO, INC., a Nevada corporation, d/b/a Landmark Hotel & Casino, Appellant,

v.

LOCAL JOINT EXECUTIVE BOARD OF LAS VEGAS, Culinary Workers Union, Local No. 226, and Bartenders Union, Local No. 165, Appellees.

BAP Nos. NV–86–1582, NV–86–1686 and NV–86–1685.
Bankruptcy No. S–85–01113.

United States Bankruptcy Appellate Panels Ninth Circuit.

Argued and Submitted Jan. 21, 1987.

Decided Sept. 30, 1987.

Gerald M. Gordon, Wiener, Waldman, Gordon & Silver, Ltd., Las Vegas, Nev., for appellant.

Timothy S. Cory, Las Vegas, Nev., for appellees.

Before VOLINN, ASHLAND and ELLIOTT, Bankruptcy Judges.

OPINION

VOLINN, Bankruptcy Judge:

## I. OVERVIEW

Landmark Hotel & Casino, Inc. (the Landmark) is a Chapter 11 debtor in possession operating pursuant to a confirmed plan. The Landmark filed an application to reject its collective bargaining agreements with seven different unions. The bankruptcy court denied its application, without prejudice. Within one week, the Landmark filed a supplemental application to reject the collective bargaining agreements. Pursuant to 11 U.S.C. § 1113(e),[1] the bankruptcy court initially entered an order of interim relief for six months, which was later extended for four more months. The order provided that under certain circumstances, the interim modifications would become permanent; and under other circumstances, the collective bargaining agreements would be rejected. No further extensions were granted, and the bankruptcy court ultimately authorized full rejection of the collective bargaining agreements.

The Landmark appeals from the order of interim relief, arguing that the bankruptcy court exceeded its jurisdiction under 11 U.S.C. § 1113 by imposing conditions on the Landmark's rejection of the collective bargaining agreements. The Landmark concedes that it consented to Section 1113(e) relief. The record reflects, however, that the Landmark's consent was ob-

---

**1.** Section 1113 provides for "Rejection of collective bargaining agreements." It requires negotiations and procedures within certain time frames before rejection can be ordered. However, recognizing that economic circumstances attending the filing of a Chapter 11 case may require immediate action, Section 1113(e) provides:

If during a period when the collective bargaining agreement continues in effect, and *if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate,* the court, after notice and a hearing, may authorize the trustee to implement *interim changes* in the rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. *The implementation of such interim changes shall not render the application for rejection moot.*

11 U.S.C. § 1113(e) (emphasis added).

tained after negotiations that were strongly encouraged by the bankruptcy court, which considered the Landmark as having preserved its right to appeal the issue of the relief granted. None of the parties has raised any issue of consent on appeal.

The major union, the Local Joint Executive Board of Las Vegas, cross-appeals from the order of interim relief, NV–86–1686, arguing that the bankruptcy court should have refrained from granting any relief until the parties had concluded negotiations on the Joint Board's second counterproposal.

The Landmark filed a separate appeal, NV–86–1685, challenging the timeliness of the cross-appeal, above, and the bankruptcy court's finding of "excusable neglect." The two appeals are consolidated by this opinion.

Prior to oral argument, this panel denied a motion to dismiss the Landmark's appeal as interlocutory. To the extent that the order appealed from was interlocutory, the panel treated the notice of appeal as a motion for leave to appeal, which was granted, pursuant to BR 8003(c).

The primary issue on appeal concerns the nature and scope of relief entered by the bankruptcy court. The question is whether the court has the power under 11 U.S.C. § 1113 to enter an order of interim relief as a "compromise" solution to the problems at hand, in lieu of simply approving or denying the debtor's application for rejection. The facts herein present, as a corollary issue, whether Section 1113(e) was invoked and responded to by the parties and the propriety of the relief by the court.

For reasons that will be more fully discussed below, the panel has concluded that this issue is not moot.

## II. FACTS

Landmark Hotel & Casino, Inc. (the "Landmark") filed a Chapter 11 petition on July 31, 1985. At that time, the Landmark employed approximately 900 union and non-union personnel, and it had collective bargaining agreements with seven different unions. The major union, appellee Local Joint Executive Board of Las Vegas ("Joint Board"), which represents Culinary Workers Union, Local No. 226 and Bartenders Union, Local No. 165, represents approximately 450 of the Landmark's employees. Its contract expires June 1, 1989. The other five unions together ("trade unions") represent about 50 of the Landmark's employees. One appellees' brief was filed by the International Brotherhood of Electrical Workers, Local No. 357 ("electricians"), the International Brotherhood of Painters & Allied Trades, Local No. 159 ("painters"), and the United Brotherhood of Carpenters and Joiners of America, Local No. 1780 ("carpenters"), which together represent fewer than ten employees of the Landmark. Another appellees' brief was filed by the International Union of Operating Engineers, Local No. 501 ("engineers"), which represents 12 of the Landmark's employees.[2] The collective bargaining agreements of the trade unions expired between April 1 and July 31, 1987.

### A. Proposals to Unions

On October 7, 1985, the Landmark presented the Joint Board with a proposal pursuant to 11 U.S.C. § 1113. The proposal asked for numerous modifications to the collective bargaining agreement including, an immediate 15 percent wage reduction; eliminating all scheduled future wage increases; eliminating the pension plan; substituting the Landmark's own medical insurance and hospitalization plan for the union's health and welfare plan; limiting paid vacations to two weeks per year; deleting two holidays (New Year's Day and Veteran's Day) and eliminating two floating holidays in lieu of those days. The Landmark also requested modifications to various other sections of the agreement.[3]

---

**2.** The only union not to file a brief on appeal is the Professional, Clerical and Miscellaneous Employees, Teamsters Local No. 995 (front-end and back-end agreements). Both agreements expired April 1, 1987.

**3.** The other modifications requested by the Landmark pertained to combination jobs (Art. 5); work shifts, work week and overtime (Art. 9); relief, steady extra and extra employees (Art. 10); restrictions on its ability to assign employees in most efficient manner to accomplish

The Joint Board responded to the Landmark by letter dated October 24, asking for more information. The Landmark responded with more information by letter dated November 26. The Landmark met with the Joint Board on December 16, after which the Joint Board sent the Landmark a letter rejecting its proposal. The Joint Board listed nine reasons for its rejection of the proposal including among those, the proposal: "requires modifications which are not necessary to permit the reorganization of the debtor;" "does not treat all affected parties fairly and equitably;" and it "would have disastrous impact upon the conditions of employment of employees represented by the Union at other hotels." The latter is an allusion to the "most favored nations" problem which will be discussed below. The Landmark responded once more to the Joint Board by letter.[4]

The Landmark presented substantially similar proposals to each of the trade unions, and met with them on November 6. These unions subsequently rejected the proposals. The electricians, the teamsters, and the engineers each responded that it would be impossible to modify the agreement due to the "most favored nations" clause. The painters referred to language in the agreement "which prohibits the action you request." The carpenters advised the Landmark that although the proposed modifications were not acceptable, they were willing to continue to negotiate in good faith.

A "most favored nations" clause is included in the collective bargaining agreements of each of the five trade unions, but not that of the Joint Board. The clause basically provides that if the union extends favorable terms to any one employer, then it must extend those same favorable terms to all of the other employers with which it has contracts. There is no exception for bankruptcy.

Even though the Landmark's collective bargaining agreement with the Joint Board does not contain a "most favored nations" clause, the Joint Board is affected because of a separate dispute it has with the Nevada Resort Association (NRA).[5] The Association apparently claims that the Joint Board is bound by the "most favored nations" concept through a firm verbal, legally binding, "me, too" commitment; the Joint Board disagrees. When the Joint Board rejected the Landmark's proposal, it was nevertheless concerned that any arrangement regarding the Landmark's employees could affect all of the 23,000 employees represented by the Joint Board. Thus, adjustment of the relationship of Landmark (which was not a member of NRA) and its employees was significantly affected by the Joint Board's concern as to the impact of any such adjustment on the relationships of other resort owners and their employees none of whom were involved in the reorganization proceeding.

## B. Application to Reject Collective Bargaining Agreements

On December 26, 1985, the Landmark filed an Application for Approval or Rejection of Collective Bargaining Agreements. The application projected a monthly shortfall of approximately $110,000–$115,000 "which can only be met as a result of labor savings through the rejection of collective bargaining agreements," and asked the bankruptcy court to approve rejection of all seven agreements. The application was supported by the affidavit of Kerry Kindig, vice president of the Landmark, who projected a net monthly deficit of approximately $111,000, and a monthly savings of approximately $191,000 if the collective bargaining agreements were rejected.

The matter was originally set for hearing within the 14 days required by 11 U.S.C. § 1113(d)(1), but was continued to January 23–24, 1986. The court heard testimony

work with fewest number of employees (Art. 16); special events (Art. 18); complimented guests (Art. 19); and bell captains' services (Exh. 8).

**4.** There were also subsequent letters between the Landmark and the Joint Board, written after

the filing of the application for rejection and before the court hearing.

**5.** The Nevada Resort Association, a confederation of hotels and casinos, is not a party here or below. The Landmark is not a member of the Association.

from seven witnesses, four on behalf of the Landmark, including a court-appointed examiner, and three on behalf of the unions.

At the close of the first day of hearing, the bankruptcy court made what it later characterized as "gratuitous" comments that were "not part of the findings of the court." The court volunteered "some preliminary indications ... of where my thinking is." He described certain areas "where I think both sides have to give a little bit." Several times the court referred to requiring "conditions" on rejection. The court expressed "the firm conviction that this is the most likely debtor to rehabilitate the property. And that simply means that the fact of life is that if sufficient conditions, proper conditions can be proposed by the debtor, the Court is going to allow rejection." The court concluded by saying, "what I'd really like to do is have you negotiate further," and suggesting to counsel that "at a minimum you ought to be prepared to argue which of those items the Court at a minimum such [sic] require as conditions to rejection."

The following day, the bankruptcy court denied the application without prejudice in an oral decision constituting the findings and conclusions of the court. No separate written order was entered.

The bankruptcy court found that the Landmark's proposals as to wages, pensions, and the health and welfare plan were modifications that were necessary to permit the reorganization of the debtor, 11 U.S.C. § 1113(b)(1)(A). The court found that there was not enough evidence to enable it to rule upon the necessity of the Landmark's proposals as to vacations and holidays. The court found that the Landmark did not meet its burden of proving the necessity of various other proposed modifications,[6] and it expressly made no finding as to the necessity of the remaining proposals.[7]

The bankruptcy court also found that the Landmark's proposals were "fair and equitable to the extent the various other parties in interest have given," i.e., both secured and unsecured creditors.[8] 11 U.S.C. § 1113(b)(1)(A).

The bankruptcy court further found that the debtor had negotiated in good faith, and although "the unions may have been somewhat recalcitrant," there were "good faith efforts to negotiate." As for whether the unions had refused to accept the Landmark's proposals "without good cause," 11 U.S.C. § 1113(c)(2), the court said, "that's a close question for me." It ruled that the unions' problems with the "most favored nations" clause did not constitute good cause because "In essence to allow this as a good cause objection would nullify 1113 ... there's certainly no showing that the unions required this provision. It was NRA, as all of the testimony, that insisted upon this provision ... all I can take cognizance of is the contract before me."

As for balancing the equities, 11 U.S.C. § 1113(c)(3), the court ruled that the Landmark had not met that standard. It ruled that the Landmark had carried the burden of proving that "without some modifications, [it] dies a financial death." But on the other side of the balance, the court said, is "a total loss of all contract rights for the employees." The court ruled that it would allow rejection of the contracts "upon the proper showing by the debtor." The court agreed with counsel that "there is no way the Court can impose, legally or lawfully, conditions upon—in a rejection order. Only the debtor can do that voluntarily for itself." The court stressed that although it was not requiring the debtor to make any voluntary concessions, they "certainly help[s] the Court. It makes the balancing test a whole lot easier on the debt-

---

6. I.e., combination jobs (Art. 5); work shifts, workweek and overtime (Art. 9); relief, steady extra and extra employees (Art. 10); and restrictions on its ability to assign employees in most efficient manner to accomplish work with fewest number of employees (Art. 16).

7. I.e., special events (Art. 18); complimented guests (Art. 19); and bell captains' services (Exh. 8).

8. The court ruled that it could not make that finding "with respect to the other [non-union] employees."

or's side for you to make that voluntary concession."

## C. Supplemental Application to Reject Collective Bargaining Agreements

Within one week, the Landmark submitted to each union a revised proposal for modifications to the current collective bargaining agreement, and on January 31, 1986 filed a Supplemental Application for Rejection of Collective Bargaining Agreements. The Joint Board received the revised proposal on the same day the supplemental application was filed with the court.

The Landmark's revised proposals were limited to those areas in which it had been successful (or almost successful) before the bankruptcy court, i.e., wages, pensions, health and welfare plan, vacations, and holidays. Its revised proposals in these areas were the same as before, except for wages, where it added a "snap-back" proposal, i.e., reinstatement of contract wage rates upon certain measures of profitability. It withdrew all of its previous proposals relating to the various other modifications. Thus, it was requesting substantial modification of the contract, not outright rejection.

On February 6, the Joint Board made a nine-part counterproposal. The Joint Board noted that the Landmark's supplemental application still projected a monthly shortfall of approximately $110,000–$115,000 to be met through labor savings. It counterproposed that every Landmark employee and officer, from the owner to the lowest paid employee, take a 15 percent pay cut, with certain limitations, resulting in a monthly savings of $116,433. As for the employees represented by the Joint Board, the union requested that the entire 15 percent be taken out of wages, with all other provisions of the collective bargaining agreement remaining intact.

The Joint Board's counterproposal also articulated the concept of interim relief, in order to by-pass the "most favored nations" problem:

8. The Joint Board will forthwith seek expedited arbitration with the Nevada Resort Association to establish that the Joint Board does not have to extend similar wage cuts to other employers.

9. Pending said arbitration decisions, the Landmark will request the Bankruptcy Court to exercise its equitable authority under Sections 105 and 1113(e) of the Bankruptcy Code and order an interim modification of the parties' collective bargaining agreement implementing the wage cut.

The Landmark rejected the Joint Board's counterproposal by letter dated February 12, on the grounds that it was unreasonable and "would not come close to providing the savings which the Debtor requires." The Landmark now projected a monthly shortfall of at least $261,000 to $338,957 that had to be achieved through total payroll savings.

As for the trade unions, the electricians continued to maintain that they were unable to modify their agreement due to the "most favored nations" clause. The engineers initially rejected the Landmark's revised proposal, saying that any agreement to modify would depend on the Landmark's willingness to retain pension benefits. Later, they said they would be prepared to discuss terms similar to the Joint Board's counterproposal. Other unions apparently did not respond.

On February 13, the Joint Board made a *second* counterproposal, which would apportion a court-determined payroll savings amount evenly among all employees and officers of the Landmark, with reductions coming out of wages, vacations, and holidays, but not pension contributions. The Joint Board's letter also said that it could only conclude from the Landmark's February 12 letter, and the tripled projected shortfall, "that the Landmark's intent is to do everything possible to reject the Joint Board's Collective Bargaining Agreement and operate non-union."

## D. Court's Oral Decision

The next day, February 14, 1986, the Landmark's supplemental application came on for hearing. As of that time, the Joint Board had not received a written or formal response from the Landmark to its second counterproposal. In opening remarks to

the court, the Landmark's attorney said that "problems still exist" with the second counterproposal, including "the same NRA interim relief problem." Later, the Landmark's attorney stated for the record that he thought he had responded to the second counterproposal that morning, and had "basically said no."

After presentation of the evidence, the court acknowledged that although "[i]t's not the Court's purpose or function to interfere in the negotiation process, I think 1113 injects some discretion of the judge or the court in making determinations of fairness or good cause." Referring to the "most favored nations" problem, the court said that although it was "very receptive to the union's concern ... it cannot be good cause for rejecting the proposals. It does have relevance to me in a couple of other areas, and it's principally in good faith areas."

### E. Order Appealed From

Following a recess, the Landmark's attorney reported that further negotiations had taken place and described an additional proposal. As for the "most favored nations" problem, the Landmark's attorney asked the bankruptcy court to enter interim relief for six months [9] for those willing to arbitrate, with the court retaining jurisdiction to extend that time period for cause, should an arbitration decision still be pending.

The court ordered interim relief [10] pursuant to 11 U.S.C. § 1113(e), effective from February 14, 1986, the date of its oral decision. It again referred to the issue of the Landmark's good faith:

If down the road, at the end of this, the term of this contract there is decertification, that's fine. But, if the rejection of the contract is used somehow as a method of procedure for obtaining decertification, then that's bad faith. And the Debtor has satisfied me in that respect,

if they're willing to impose upon themselves conditions.

The order of interim relief, which is the order appealed from, was entered June 9, 1986. It consists of 15 pages, divided into two parts: Part A, concerning the five trade unions; and Part B, concerning the Joint Board. Modifications common to both parts included a 15 percent wage reduction; elimination of future wage increases; continued participation in the union's health and welfare plan (or trust fund), provided that the debtor's contributions would not increase; limitation of paid vacations to two weeks per year; elimination of two holidays (New Year's Day and Veterans' Day) and elimination of two floating holidays in lieu of those days; and certain "snap-back" provisions that would become operative in the event the debtor's financial position improved.

Pension contributions were eliminated as to the five trade unions, but the Joint Board was allowed a choice between no more pension contributions or an equivalent reduction in wages, up to a maximum reduction of 20 percent of current wages.

The interim relief described above was made contingent expressly on the unions seeking arbitration with the NRA over the "most favored nations" (or "me, too") issue. If a union did not arbitrate, or if an arbitrator ruled that the union was bound by a "most favored nations" clause (or a "me, too" commitment), then the bankruptcy court was to enter an order allowing immediate rejection of the collective bargaining agreement. However, if an arbitrator ruled that the union was not bound by a "most favored nations" clause (or a "me, too" commitment), then, as for the five trade unions, the interim relief would constitute permanent modifications of their current collective bargaining agreements with the Landmark. The Joint Board was allowed a choice: if it so agreed, then the interim relief would constitute permanent

9. Landmark's labor attorney and negotiator, Kevin Efroymson, had previously testified that Section 1113(e) interim relief was unacceptable to the Landmark "because you don't have anything at that point on which you can rely on."

10. Counsel for the trade unions stated for the record that they did not agree with the appropriateness of an order of interim relief, although they planned to arbitrate with the NRA.

modifications; but if it did not agree, then the bankruptcy court was to enter an order allowing immediate rejection.

Both parts of the order provided that the Landmark had "voluntarily agreed to adhere to and abide by" the remaining, unmodified, provisions of any rejected collective bargaining agreement, so long as the union abided by the "no strike—no lockout" article of the same agreement.

The final paragraph of the order provided that the Landmark's application was "granted on the terms and conditions" as set forth above.

The Landmark filed a timely notice of appeal on June 17, 1986. The Joint Board filed a notice of cross-appeal on July 17, 1986, after obtaining an order from the bankruptcy court extending time for appeal. The Landmark then filed a timely notice of appeal from the order extending time for the cross-appeal.

### F. Subsequent Events

At the time the order of interim relief was being argued, the Landmark was moving towards confirmation of a plan. On April 7, 1986—after the court had orally authorized interim relief, but before the written order was entered—the bankruptcy court entered an Order Confirming Second Amended Plan. With respect to all seven collective bargaining agreements, the plan contemplated the possibility of rejection:

> ... unless agreement is reached to modify the term of said executory contracts by the date of confirmation, it is the intention of Debtor to reject these executory contracts and to treat any damages incurred thereby as unsecured claims to be impaired as provided for in Class 21.

The order of interim relief originally lasted for six months, through August 1986. The court later extended this time period, for cause, through December 31, 1986, and then still later, through January 5, 1987. No further extensions were granted. On January 5, the court orally rejected the collective bargaining agreements, by operation of the terms of the interim order. The written order authorizing such rejection was entered February 11, 1987.

### III. MOOTNESS

Inasmuch as these contracts had already been ordered rejected by the time of oral argument, this panel raised the issue of mootness *sua sponte*, as it may do. *See Wheeling—Pittsburgh Steel Corp. v. United Steelworkers*, 791 F.2d 1074, 1078 (3d Cir.1986). The Landmark's attorney argued that this appeal is not moot because it was entitled to full relief as of January 23 or 24, or, at a minimum, February 14, 1986. The panel was advised by counsel for Landmark and for the Joint Board that the Landmark had not fully complied with the interim order. Apparently, the Joint Board's employees exercised the option to have their pension contributions taken out of wages. Although the Landmark has been withholding about 47-48 cents per hour from the wages of Joint Board employees for this purpose, it has not been turning those monies over to the employees' pension fund. Nor, apparently, has the Landmark been making payments to the union employees' health and welfare plans. Thus, the Landmark argues it is faced with a potential administrative claim of approximately $800,000 if the order of interim relief is upheld on appeal. The facts and circumstances thus brought to light are sufficient to convince us that we are presented with a live case or controversy that needs to be resolved.

### IV. NATURE AND SCOPE OF RELIEF

#### A. Contentions

The Landmark contends that the bankruptcy court exceeded its jurisdiction under 11 U.S.C. § 1113 by acting as an arbitrator and by imposing conditions for rejection. It argues that the unions used the "most favored nations" issue (and the "real or perceived threat" of reciprocal concessions that their non-Landmark union members would be required to make) as an excuse to refuse to negotiate, and that the court endorsed this excuse by ordering a solution to the union "stonewall" instead of granting the debtor full relief. It contends that the court lacked jurisdiction to do anything oth-

er than reject the agreements, if the Landmark's proposals, as submitted to the unions, complied with Section 1113.

The Joint Board contends that the court's imposition of conditions was consistent with the statutory requirement that the debtor's proposals be fair and equitable. The court's encouragement of negotiations was neither prohibited by, nor inconsistent with, law or policy. The conditions resulted not from the court's own entry into the collective bargaining process, but from the court's concern over the Landmark's good faith.

The electricians, painters, and carpenters contend that the Landmark did not meet its burden of showing that the "balance of the equities clearly favors rejection," 11 U.S.C. § 1113(c)(3). They argue that although the debtor failed to show that complete rejection was necessary, it did show a need to cut back on expenses, and the court responded pursuant to law.

The engineers contend that the court acted well within the scope of its jurisdiction by granting interim relief. The debtor was unable to establish that full rejection was necessary for a successful reorganization.

### B. Code Section 1113, Legislative History, and Case Law

A Chapter 11 debtor in possession, such as the Landmark, may assume or reject a collective bargaining agreement only in accordance with the provisions of Section 1113. 11 U.S.C. § 1113(a). The court "shall approve" an application for rejection "*only if* the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; *and*

(3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(c) (emphasis added).

A proposal that "fulfills the requirements of subsection (b)(1)" must be made after filing the bankruptcy petition and before filing an application seeking rejection, as here. 11 U.S.C. § 1113(b)(1). It must provide:

—for those *necessary* modifications in the employees benefits and protections that are *necessary* to permit the reorganization of the debtor and

—assure[s] that all creditors, the debtor and all of the affected parties are treated *fairly and equitably*

11 U.S.C. § 1113(b)(1)(A) (emphasis added).

Congress enacted Code Section 1113 as part of the 1984 Amendments to the Bankruptcy Code, in response to the U.S. Supreme Court's decision in *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), which held that a collective bargaining agreement was an executory contract subject to rejection by a debtor in possession under 11 U.S.C. § 365(a). There is no authoritative legislative history, as there were no committee reports. The "legislative history" consists of comments by individual members of Congress reported in the Congressional Record. *See* 5 Collier on Bankruptcy ¶ 1113.01[1] (15th ed. 1986); 130 Cong.Rec. H7494–96 (daily ed. June 29, 1984); 130 Cong.Rec. S8897–8900 (daily ed. June 29, 1984). The individual statements of legislators as to their views of the meaning of the legislation were made in the wake of last minute compromises effected in order to finally enact the sorely needed BAFJR 1984. A number of these statements reflect divergent views as to the purport of the legislation and its effect on *Bildisco*. Such do not reflect the collective intent or will of Congress. *See, e.g., Garcia v. United States*, 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984), and cases cited therein.

Nevertheless, two principles clearly emerge from any study of the statute and the evolving case law interpreting it. First, the statute contemplates initial use of the collective bargaining process. Second, the bankruptcy court's role is to assess the parties' compliance with the statutory requirements, and to ensure a balancing of the equities. *See, generally In re Royal Composing Room*, 62 B.R. 403, 405 (Bankr.S.D.N.Y.1986). The standards

for allowing interim relief are different than those for allowing full rejection. Interim relief is permissible "if *essential* to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate." 11 U.S.C. § 1113(e) (emphasis added). In the interim relief context, the court focuses on the "bare minimum requirements for short-term survival," which is different from the "necessary" changes that will enable the debtor to complete the reorganization process successfully if the contracts were fully rejected. *Truck Drivers Local 807 v. Carey Transportation, Inc.*, 816 F.2d 82, 89–90 (2d Cir.1987) (criticizing *Wheeling-Pittsburgh Steel Corp. v. United Steelworkers, supra,* for concluding that "necessary" as used in Section 1113(b)(1)(A) is synonomous with "essential" as used in Section 1113(e)). *See also In re Salt Creek Freightways,* 46 B.R. 347, 349–50 (Bankr.D.Wyo.1985).

The bankruptcy court in the present case repeatedly recognized that "the Court, as much as possible, should stay out of the negotiation process." (Jan. 24, 1986 transcript at 153) It also recognized the distinction between the standards of "necessary" and "essential." (*Id.* at 146)

### C. Conclusion

This case was in a unique posture from the very beginning because of the "most favored nations" problem. The bankruptcy court held that such concerns did not constitute "good cause" for the unions to refuse to accept the Landmark's proposals, 11 U.S.C. § 1113(c)(2), because they involved contracts other than those before the court. *See In re Salt Creek Freightways,* 47 B.R. 835, 840–41 (Bankr.D.Wyo. 1985). The unions do not challenge this finding on appeal.[11] The bankruptcy court recognized that the "most favored nations" problem was not only a factor in the unions' refusal to accept a proposal, but it would also continue to impede the entire collective bargaining process between the unions and the debtor. The court referred to *In re Cook United, Inc.,* 50 B.R. 561

(Bankr.N.D.Ohio 1985), where the court denied a debtor's motion to modify or reject, saying, "By denying Cook's motion, this opinion simply requires the debtor to bargain with the union for any changes in the existing agreement, rather than imposing these changes by judicial decree." *Id.* at 564. The bankruptcy court in the present case observed that the Landmark could not similarly go back to the unions to renegotiate the contracts because of the "most favored nations" or "me, too" issue, so "that alternative doesn't hold out a lot of hope obviously ..." (Jan. 24, 1986 transcript at 143)

From our review of the record and transcripts, it is clear that the bankruptcy court considered the "most favored nations" problem as a factor in balancing the equities under 11 U.S.C. § 1113(c)(3). Until there was a solution to that problem, the balance of equities did not clearly favor rejection. When the Landmark came back into court with essentially a scaled-down version of its original proposal, and with obvious disregard for the Joint Board's counterproposal, the court began to question seriously the Landmark's good faith, which is also a factor in balancing the equities. *See Truck Drivers Local 807 v. Carey Transportation, Inc.,* 816 F.2d at 93.

The interim relief so strenuously challenged by the Landmark on appeal was first proposed by the Joint Board, not by the bankruptcy court. We therefore cannot accept the Landmark's contention that the bankruptcy court intervened too far into the collective bargaining process protected by Congress in Code Section 1113. The court was presented with a unique situation and repeatedly encouraged the parties to come up with their own solution to it. Finally, one of them did. While it was not one of the more orthodox solutions contemplated by Section 1113, we do not see how the bankruptcy court in any way exceeded his jurisdiction in approving it. *Cf. In re Blue Ribbon Transportation*

---

**11.** Neither the Joint Board nor the engineers challenge this finding. The brief filed by the electricians, painters, and carpenters refuses to concede the issue, but argues that it need not be decided here. Brf. at 6.

*Co., Inc.,* 30 B.R. 783 (Bankr.D.R.I.1983) (court permitted rejection—pre-section 1113 —only if debtor met certain court-imposed conditions that reduced management costs).

The entry of interim relief was not accompanied by the precise findings required by Section 1113(e) being expressly made. We are satisfied that the bankruptcy court impliedly found interim relief to be "essential to the continuation of the debtor's business" when it ruled Landmark had proven that "without some modifications, this debtor dies a financial death." It is clear that the court did all in its power to balance the equities between the parties and to effect, pursuant to Section 1113(e), resolution of the debtor's economic survival with preservation, at least on an interim basis, of the employees' interest in continuing to work, without outright rejection of the collective bargaining agreement. The court's order was appropriately based on its equitable powers under Section 1113(e).

### V. OTHER ISSUES

None of the other issues raised by the Landmark in its main appeal need be addressed in any detail. The Landmark challenges the bankruptcy court's findings that certain proposed modifications were not "necessary." But the order appealed from was entered upon the Landmark's supplemental application for rejection, by which time it had withdrawn these previously requested modifications from consideration. Thus, they were no longer at issue at the time the order appealed from was entered.

The Landmark also complains that the bankruptcy court erred by treating the five trade unions "on par" with the Joint Board, the only union to produce witnesses at the court hearings. There is no merit to this contention. The record on appeal is voluminous. It reflects that the court had the collective bargaining agreements of each of the seven unions before it, as well as the Landmark's proposals and revised proposals to each of these unions, and their responses. Testimony was taken from the Landmark's labor attorney as to the debtor's negotiations with each of these seven unions. All of the unions were represented by counsel at the hearings. The order appealed from distinguished the Joint Board from the five trade unions.

The Joint Board's position on its cross-appeal is that the bankruptcy court erred by ruling on the Landmark's application while the Joint Board's second counterproposal was still pending. During oral argument, counsel for the Joint Board suggested that this argument need be considered only if the panel were to rule that the bankruptcy court did not have authority to enter interim relief. Inasmuch as this decision upholds the order appealed from, neither the cross-appeal, nor the Landmark's separate appeal challenging the timeliness of the cross-appeal, need be addressed.

### VI. CONCLUSION

The order of interim relief, entered on June 9, 1986, is affirmed.