**In re FIBER GLASS INDUSTRIES, INC., Debtor.**

**In re F.G.I. FIBERS, INC., Debtor.**

**In re NORTHEAST FIBER GLASS INDUSTRIES OF AMSTERDAM, INC., Debtor.**

**In re HOMESTEAD PLACE CORP., Debtor.**

**Bankruptcy Nos. 84–11231 to 84–11234.**

United States Bankruptcy Court, N.D. New York.

April 26, 1985.

DeGraff, Foy, Conway, Holt-Harris and Mealey, Albany, N.Y. (John D. Rodgers, Albany, N.Y., of counsel), for debtors.

Cohen, Weiss and Simon, New York City (Richard M. Seltzer, New York City, of counsel), for United Paper Makers Union, Local 1370.

## MEMORANDUM–DECISION AND ORDER

JUSTIN J. MAHONEY, Bankruptcy Judge.

Fiber Glass Industries, Inc. ("F.G.I."), F.G.I. Fibers, Inc., Northeast Fiber Glass Industries of Amsterdam, Inc. ("Northeast"), and Homestead Place Corp., (collectively referred to as "debtors"), filed an application on February 22, 1985 seeking rejection of a collective bargaining agreement between Northeast and The United Paper Makers Union, Local 1370 ("Union"). The Union opposes the relief sought. Both the debtors and the Union representative presented testimony at hearings conducted on March 6 and March 12. This order constitutes the Court's ruling in accordance with 11 U.S.C. § 1113(d)(2).[1]

The United States Supreme Court in *N.L. R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), recognized that collective bargaining agreements may be rejected in bankruptcy. In the aftermath of *Bildisco*, Congress codified the standard to be applied in determining whether a debtor will be permitted to reject a collective bargaining agreement, adopting in substantial part the test enunciated by the Supreme Court. The result is set forth in 11 U.S.C. § 1113.[2] In summary, the statute requires that the debtors, after filing the bankruptcy petition, make a proposal to the employee representative which provides for "those necessary modifications in the employee's benefits and protections that are necessary to permit the reorganization of the debtor ..." The proposal must be based upon correct and reliable information.

It is the debtors' burden to provide the employee representative "with such relevant information as is necessary to evaluate the proposal" and to meet with the employee representative in an attempt to reach a mutually agreeable modification of the agreement after the proposal is made right up until the time of the hearing to consider rejection of the collective bar-

1. At the March 12 hearing, the debtors and Union representative agreed to permit the Court until April 29 to rule on the application.

2. Section 1113 of Title 11 provides in pertinent part:

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

gaining agreement. The Court shall approve an application for rejection of a collective bargaining agreement only if the Court finds that the employee representative without good cause has refused to accept a proposal meeting the foregoing requirements and the equities favor rejection of the collective bargaining agreement. In applying the statute to the present application before the Court, a brief review of the chapter 11 proceedings to date is required.

The debtors filed for chapter 11 relief on September 28, 1984. The companies are variously involved in the production and manufacture of glass fibers and reinforced glass fabric for sale to industries which use the glass reinforced fabric in the manufacture of their own products. At the time of filing for relief, the debtors employed 150 employees, 60 of which were members of the union and employed by Northeast. The remaining 90 employees of the other three companies were nonunionized.

In the schedules filed on November 16, F.G.I., the parent company of the other three debtors, reflected assets of 1.4 million and 1.6 million total debts of which $400,000 is secured.[3] These figures do not include the contingent liability of F.G.I. on the debts of F.G.I. Fibers, Inc. which has assets of 17.7 million and an indebtedness of 19.2 million. Northeast's schedules reflect debts of approximately $103,000 and property valued at $406,000. A substantial part of its property, however, $342,000 in machinery and equipment is pledged as security for a $676,000 debt of Homestead Place Corp., a fact not disclosed on Northeast's schedules. Homestead Place Corp.'s property is valued at $121,000 on its schedules with a debt structure of $766,000.

The chapter 11 petitions were filed after Schenectady Trust Company seized F.G.I. inventory and sought to apply F.G.I. accounts receivable held by the bank as a set-off against monies owed under the debtors' financing agreement.

In January, 1985, the debtors made application to the Court for approval to enter into an agreement, the purpose of which was to obtain immediate capital and to transfer ownership and management of the debtor to David Gordon. Under its terms, Gordon, who has considerable experience in working with financially troubled companies, agreed to work for the company for one year without compensation, and further agreed to make a $99,000 loan to the debtors that would be convertible into stock ownership of F.G.I. upon the completion of certain conditions. Included among the required conditions are formulation and confirmation of a chapter 11 plan of reorganization and, pertinent to the present discussion, the condition that:

"... the Collective Bargaining Agent for the employees of the Corporation agreed, or the Bankruptcy Court or other Court of competent jurisdiction orders, the modifications (or their equivalent) of the current Collective Bargaining Agreement ..." ¶ 5(D.) on page 4 of the Agreement between F.G.I., David Gordon and Ara Dildilian.

In the event that the conditions are not met, the Agreement provides that Gordon would be entitled to an administrative priority expense claim in the amount of $99,000. On January 18, 1985 the Court approved the proposed Agreement. Gordon advanced $99,000 to the debtors and assumed the role of president and chief executive officer of F.G.I.

Gordon's initial experience with the company began in 1983 when the debtor requested him to make an analysis of its financial condition. Additionally, eight months prior to assuming control, he served on an advisory panel to the debtor.

Gordon testified to the poor financial condition of the debtor. Exclusive of depreciation, anticipated losses for the fiscal year ending March, 1985 were 1.5 million. Gordon testified that at the time he assumed control, there was no working capital and

---

**3.** An exhibit labeled "A" attached to the same schedules lists total assets of F.G.I. at 3.7 million and liabilities of 4.1 million. This discrepancy is consistent with Gordon's testimony that the accounting figures are questionable.

staffing levels were "horrendous." The Homestead Plant had only 10 to 20 percent productivity. While the debtor had experienced "serious sales decline," the cost of operations remained constant. (Tr. 17, 18) Gordon mistrusted the accounting figures and felt that they did not accurately reflect the amount of inventory available for sale.[4]

Based upon his analysis, Gordon determined that substantial cost reductions had to be made immediately. On his first day, Gordon reduced the office staff by 50 percent and reduced factory supervisory staff by 50 percent. Gordon described his approach:

"We were attacking every place we could see ... something that could be attacked easily, quickly." (Tr. 24)

"Problems are so great cannot realistically look at one area and say, 'This is where the problem is.' The cost of operations are wrong from top to bottom. It's not only the bargaining unit, it was the non-bargaining unit. It was the administrative sales staff. It was the basic cost of manufacturing, the basic selling prices, the entire operation had problems. It's been more or less a hipshoot from day one." (Tr. 43, 44)

During the first three weeks, total costs were reduced by $500,000.

As part of his cost reduction program, Gordon turned his attention to the collective bargaining agreement dated April 1, 1984 which under its terms was to continue until March 31, 1986. Gordon requested a meeting with the Union to present a proposal "... that attacked what I felt was an excessive fringe benefit package expense." The average employee cost covered by the collective bargaining agreement was estimated at 9.17/hour based upon an average wage cost of 6.03/hour and a fringe package of 3.14/hour which included pension, death insurance, vacation and holidays.

In formulating the proposal, Gordon, together with the treasurer of F.G.I., projected that a minimum of $130,000 savings must be absorbed by Northeast employees if Northeast is to be successful in reorganizing. According to Gordon's affidavit, this figure was based upon the 1.5 million projected loss of the debtors for fiscal year ending March, 1985. As further explained by Gordon, the $130,000 required savings was derived from his determination that total manufacturing expenses of $682,000 for Northeast and its related affiliate selling organization required a 30 percent cut or a $210,000 overall reduction. Of the $210,000, $130,000 was deemed to be Northeast's portion of the required cut. Gordon alternatively explained the savings as .99 per hour per employee based upon 2,080 work hours expended annually per employee, with 60 Union members then employed.

Gordon presented the proposal to the Union on January 21. Eight concessions were requested with regard to the debtors' fringe benefit package. In addition, Gordon sought to eliminate the .30/hour pay increase scheduled for April 1 of this year and proposed a 3 year contract with increases of .15/hour effective on February 1 of each year beginning in 1986.

On January 22, the Union met to vote on the proposal. It agreed to waive the scheduled .30 April 1 raise, to accept a two year contract with the proposed .15/hour yearly increase and to accept six of the eight proposed adjustments to their fringe benefits package.[5] The company responded

---

4. At the March 6 hearing, the Court also considered and approved appointment of an accountant to conduct an audit of the debtor's operations.

5. As reported in the minutes of the January 22, 1985 meeting between the company and the Union committees, the concessions that the Union members were willing to make follow:

1. They would forego the .30 increase in the contract for 4/1/85.

2. They will forego the longevity bonus.
3. They will agree to $3 prescription drug co-pay.
4. They will agree to 8 holidays and working the day before and the day after.
5. They will agree to $5 per week contribution to dependent hospitalization.
6. They will agree to eliminate dental coverage.
7. They will agree to a two year contract with the increase as proposed.

that the total dollar savings of the changes agreed to (not accounting for the .30 April 1 scheduled raise) amounted to $28,993 or only 22 percent of the total savings which were required.

On January 28, the Union was further advised that the company, after being cancelled for nonpayment of benefit premiums, had switched from Blue Cross to Blue Shield coverage and eliminated dental and prescription drug coverage.[6] Gordon requested that the Union not only agree to these modifications after the fact, but also agree to pay for family medical coverage. The Union agreed to the modifications but insisted that the debtors continue to provide dependent medical coverage with each employee contributing $5.00/week toward its cost.

The debtors, not satisfied with the foregoing emergency concessions made by the Union, which they tabulated at $23,000, stressed the need for additional benefit reductions in the amount of $107,000. The debtors' basic response to any counterproposal of the Union was that a fixed savings of $130,000 was required and the only apparent negotiable point was what combination of concessions in the wage and fringe package achieved the desired goal. Gordon held firm while continuing to invite discussion right up until the March 6 hearing.

This Court cannot evaluate the proposal and counterproposals with the aim of formulating a substantive solution to the parties' differences by fixing the terms of the collective bargaining agreement, nor would it be appropriate to do so. *N.L.R.B. v. Insurance Agents' Intern. Union*, 361 U.S. 477, 488, 80 S.Ct. 419, 426, 4 L.Ed.2d 454 (1960). Rather, the issue in bankruptcy is whether the debtors may be permitted to reject the contract in its entirety.

Initially, the debtors' proposal must fulfill the statutory requirements of § 1113(b)(1)(A) by providing only for those modifications necessary to permit the reorganization of the debtor. Although it is clear from the legislative history that the debtor is not required to have a detailed plan of reorganization, as the term is used in its technical sense under § 1123, the debtor does need to justify the particular modifications in light of a general scheme. 130 CONG.REC. § 8898 (June 29, 1984). "The New Law on Rejection of Collective Bargaining Agreements in Chapter 11: An Analysis of § 1113," Richard H. Gibson, 58 AM.BANKR.L.J. (1984) 325, 337 n. 47.

■ Preliminarily, Gordon's reduction in costs were done without any specifics supporting the reductions except an obvious need to control operating expenses. Merely demonstrating a resultant savings to the debtor to justify a modification does not appear to meet the statutory standard without the additional showing that but for this particular savings reorganization cannot be achieved. No evidence was offered by the debtors as to how the precise figure of $130,000 was keyed into an overall plan of reorganization.

The debtors argue that the Union benefits are excessive as compared to benefits received by other workers in the same trade and that the failure of the Union to accept the proposal will jeopardize reorganization by adversely affecting the attitude of nonunionized employees who have fully

---

8. They will agree to the American Arbitration Association and in paying one-half of expenses.

9. They agreed not to get paid for time spent on Union business.

10. They agreed to switch from Blue Cross to Blue Shield (providing that pre-existing conditions would be covered under the Blue Shield, mainly pregnancies).

The Union advised that only two conditions could not be changed:

1. Elimination of the manufacturing bonus.

2. Changes in the vacation pay proposed, the terms of which were allowing for one week vacation with two percent prior years gross pay up through five years service and two weeks vacation with four percent prior years gross pay beyond five years service.

The net savings calculated by the company on the vacation pay modification was $20,000 based on 60 employees.

6. This unilateral action by the company, without prior approval of the Union, appears to be a technical breach of the collective bargaining contract.

cooperated with Gordon. Neither contention is substantiated by the record. While the evidence does establish that the nonunionized employees have made many concessions regarding their pay and benefits, these employees did not have the protection afforded by a collective bargaining agreement and the debtors were largely free to dictate new employment terms.

From the time the initial proposal was formulated and presented, up until the hearings on rejection, the debtors laid off 20 Union Employees at an average annual salary of $9,000. The effect of this action was a minimum annual savings to Northeast of $180,000.[7] This savings was not credited toward the $130,000 savings that Gordon indicated had to be absorbed by Northeast employees.[8]

The $130,000 "necessary" savings initially presented as the index for the necessary modifications was not a reliable figure. Gordon's alternative formula that he required a concession of .99 per employee is equally unreliable. Instead of a necessary projected savings dictating what modifications had to be made, the testimony reflects that Gordon first predetermined what concessions he wanted from the Union:

> "I think the problem is that it is not the concept of what the total dollars amount to but what the concessions are per employee, what the employee has to give back rather than what the total dollar amounts to." (Tr. 58)

■ Section 1113(b)(1)(B) requires the debtors to provide the Union representative with "such relevant information as is necessary to evaluate the proposal." At the time the proposal was presented to the Union, no mention had been made of any anticipated lay off of Union workers. The anticipated possibility or probability, as it were, that one-third of the Union work force would have to be laid off appears to be "relevant information," as the term is used in § 1113(b)(1)(B), which ought to have been disclosed to the Union representative.

Finally, this Court is not satisfied from the record that the debtors have complied with § 1113(b)(2) in attempting to reach mutually satisfactory modifications. As reported in the minutes of the January 22 meeting between the Union representative and Gordon, one of the changes which the Union employees would not accept was elimination of the manufacturing bonus, estimated to be at an average cost of .61 per hour per employee which is calculated to cost the debtors $80,000/year.

Gordon testified that his objective was to establish a true manufacturing incentive program that everyone would understand and could individually calculate on a weekly, even daily basis. He indicated that a different bonus program would take three or four months to develop and implement. This area could have been more thoroughly explored and developed as an alternative to the modifications now urged to be "necessary."

One of the debtors' main contentions in support of rejecting the collective bargaining agreement before the Court is the argument that its rejection is a condition to Gordon's eventual ownership and continued control of the companies, as outlined in the Agreement approved by this Court on January 22, and that his continued involvement is the key to a successful reorganization.

This Court recognizes Gordon's capabilities and his apparent competence and business acumen. However, this Court cannot subordinate the statutory standard outlined in § 1113 for rejection of a collective bargaining agreement to a condition in a contract clearly inserted for Gordon's benefit and capable of being waived by him.

---

**7.** Since the annual salary quoted does not include fringe benefits paid by the corporation nor FICA and Social Security payments per employee, the actual savings to the company was much greater.

**8.** For the part of the manufacturing savings that was to be absorbed by F.G.I., however, the money saved by the elimination of three supervisory positions was included as part of their 30 percent reduction.

Notwithstanding the debtors' severe financial problems, application of § 1113 to the record before the Court does not permit approval of the debtors' application to reject the collective bargaining agreement and the application is hereby denied.

It may be that Gordon is correct in his contention that without substantial modification of this contract, the debtors face liquidation. The debtors have a further period of at least 60 days to continue their present operation and to submit a chapter 11 plan. During this interim period, the debtors and the Union are urged to continue their negotiations. The Court expresses the hope that the Union will use its best judgment in determining what further concessions it must make in order to permit the debtors to effect a successful reorganization.

It is so ORDERED.