**In re MILE HI METAL SYSTEMS, INC., Debtor.**

**SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, LOCAL 9, Appellee,**

v.

**MILE HI METAL SYSTEMS, INC., Appellant.**

No. 86–2912.

United States Court of Appeals, Tenth Circuit.

March 20, 1990.

Robert M. McConnell, Collins & McConnell (formerly of Holland & Hart), Colorado Springs, Colo. (Robert M. Duitch, Duitch & Johnson, P.C., Colorado Springs, Colo., with him on the briefs), for appellant, Mile Hi Metal Systems, Inc.

Ellen M. Kelman (Walter C. Brauer, III, with her on the brief), Brauer & Buescher, P.C., Denver, Colo., for appellee, Sheet Metal Workers' Intern. Ass'n, Local No. 9.

Before SEYMOUR, ANDERSON, and BRORBY, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

This appeal requires us to interpret for the first time 11 U.S.C. § 1113 ("section 1113"), which sets forth the procedures and conditions under which a debtor-in-possession or trustee may reject a collective bargaining agreement. At the heart of this matter is the requirement in section 1113(b)(1)(A) that the debtor make a proposal which sets out:

"those necessary modifications in the employees [sic] benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably."

The district court ruled that in no event may the proposed modifications violate federal labor laws, and that for a debtor's motion to reject a collective bargaining agreement to be granted the debtor must propose only modifications to the agreement which are absolutely necessary for it to reorganize. Because we disagree on both counts, we reverse the judgment of the district court and remand the case for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 12, 1985, appellant-debtor Mile Hi Metal Systems, Inc., filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. Thereafter, members of appellee Sheet Metal Workers' International Association, Local No. 9 ("the Union") walked off the job sites and Mile Hi hired non-Union replacement workers. On June 10, Mile Hi filed a motion to reject its collective bargaining agreement with the Union.

Attached to the motion was a copy of a letter which Mile Hi had sent to the Union twelve days earlier, setting out proposed modifications in the collective bargaining agreement. Two of the proposed modifications, plus one subsequent oral statement by a Mile Hi representative, are relevant to this appeal. They are as follows:

"1. That Article 5, paragraph 5–1 [of the collective bargaining agreement] be modified to reflect that the employer will be permitted to hire Non–Union permanent employees as replacements for strikers without the requirement that those employees become Union members except and unless such employees desire membership in the Union.

. . . .

3. That Article 4, paragraph 4–4 be modified to reflect that a Steward will only be required if there are three (3) or more *Union* employees on any job."

R.Vol. I at 25–26 (emphasis in original). During the hearing on the motion, one of

Mile Hi's owners stated that the non-Union replacement workers would be paid "at whatever rate [Mile Hi] could hire them rather than at the contract rate." R.Vol. IV at 38.

No meetings or negotiations between the parties took place until after Mile Hi applied for authorization to reject the agreement. The parties met once before the hearing, with no success. Shortly after the hearing commenced, the bankruptcy court adjourned the proceedings to allow further negotiation. No result came from these meetings, either. The Union's position in the negotiating sessions was that some of the proposed modifications were illegal as a matter of labor law, and that it would consider no part of the proposal until the offending provisions were eliminated. Mile Hi's representatives insisted upon the legality of the provisions and refused to delete them.

The hearing resumed, and Mile Hi's motion was granted. The bankruptcy court did not consider the Union's allegations that some of the modifications were contrary to labor law. Instead, the court stated:

"[T]he Union ... has alleged that there were illegal provisions in the hiring of non-Union replacements and the Court finds that it has no jurisdiction or authority to decide that issue but finds that it is not a basis to reject the proposal in total [sic] and that the Union should have, in good faith, accepted all other provisions

so that there could have been a determination of whether or not that specific proposal was acceptable."

Order on Debtor's Motion to Reject Collective Bargaining Agreement, June 20, 1985, p. 3.

The district court reversed, declaring the bankruptcy court's refusal to consider the Union's allegations to be an error of law. *See In re Mile Hi Metal Sys., Inc.*, 67 B.R. 114, 117 (D.Colo.1986). The court went on to find that the disputed provisions were not "necessary," as section 1113(b)(1)(A) requires, because they exceeded the absolute minimum needed for Mile Hi's reorganization. *Id.* at 118. In addition, the court found that the proposed wage differential would have been an unfair labor practice, and consequently that the proposal did not satisfy the requirement in section 1113(b)(1)(A) of treating the Union "fairly and equitably," and justified the Union in refusing even to consider it. *Id.* Our reading of the statute leads us to different conclusions. Accordingly, we reverse the district court, vacate the order of the bankruptcy court, and remand for further proceedings.[1]

## II.  DISCUSSION

Section 1113 was passed in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), which permitted a debtor to reject a collective bargain-

1. The Union has moved to dismiss this appeal on the grounds of mootness, based on the fact that Mile Hi's Chapter 11 proceedings were dismissed during the pendency of the appeal after Mile Hi's business failed and it ceased operations. An arbitration proceeding between the parties involving the collective bargaining agreement was allowed to go forward simultaneously with the proceedings in the bankruptcy court, and resulted in an award against Mile Hi for approximately $700,000. The basis of the award is Mile Hi's failure to abide by the agreement after the district court retroactively reinstated it, following the bankruptcy court's decision. Thus, the basis of the award is directly affected by this appeal. Because the Union has made it clear that it intends to pursue this award against Mile Hi (which continues to exist

as a corporate entity) and whatever other targets present themselves, a controversy between the parties still exists sufficient to sustain our jurisdiction. *See Haig Berberian, Inc. v. Cannery Warehousemen*, 535 F.2d 496, 498 n. 1 (9th Cir.1976); *cf. Rogers v. Fedco Freight Lines, Inc.*, 564 F.Supp. 1169, 1176 (S.D.Ohio 1983).

Because we have continuing jurisdiction, the bankruptcy court continues to have residual jurisdiction sufficient to entertain the remand which we direct the district court to make, and to conduct further proceedings consistent with this opinion. In fact, while this appeal was pending the bankruptcy lacked the power to divest itself of jurisdiction over this matter. *Cf. Gormong v. Local Union 613*, 714 F.2d 1109, 1110 (11th Cir.1983).

ing agreement unilaterally. Congress agreed that a debtor should be able to reject the agreement, but not that it should be able to do so on its own.[2] Section 1113 provides in pertinent part:

"(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession ... shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement ... which provides for those necessary modifications in the employees [sic] benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably;

....

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the [debtor-in-possession] shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the [debtor-in-possession] has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement."

11 U.S.C. § 1113(b)(1)(A), (b)(2), (c).

The legislative history of section 1113, which has been explored in detail elsewhere, *see, e.g., In re Royal Composing Room, Inc.,* 848 F.2d 345, 352–54 (2d Cir. 1988) (Feinberg, C.J., dissenting), *cert. denied,* —— U.S. ——, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989); Rosenberg, *Bankruptcy and the Collective Bargaining Agreement—A Brief Lesson in the Use of the Constitutional System of Checks and Balances,* 58 Am.Bankr.L.J. 293, 311–21 (1984), consists of little more than self-serving statements by opposing partisans. No committee reports were issued on the statute, apparently because no agreement on content could be reached. *See In re Carey Transp., Inc.,* 50 B.R. 203, 206 (Bankr.S.D. N.Y.1985), *aff'd sub nom. Truck Drivers Local 807 v. Carey Transp., Inc.,* 816 F.2d 82 (2d Cir.1987). When legislative history is "scant and capable of differing interpretations," we are hesitant to consider it "a reliable indicator of [Congressional] intent." *Miller v. Commissioner,* 836 F.2d 1274, 1282–83 (10th Cir.1988); *see also Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984). We therefore confine our analysis largely to the words of the statute itself, taking into account other judicial interpretations. *See In re Landmark Hotel & Casino, Inc.,* 78 B.R. 575, 583 (Bankr. 9th Cir.1987), *appeal dismissed,* 872 F.2d 857 (9th Cir.1989); Cosetti & Kirshenbaum, *supra* note 2, at 193.

---

**2.** Far from being a dead letter, as the concurring opinion implies, *infra* at 897, *Bildisco* "remains an important indicator" of the meaning of the Bankruptcy Code. *In re Sierra Steel Corp.,* 88 B.R. 314, 316 n. 2 (D.Colo.1987). This is so because, while section 1113 created new procedural requirements, it did not overrule, but in fact codified, *Bildisco*'s substantive standards. *See, e.g., In re Fiber Glass Indus., Inc.,* 49 B.R. 202, 203 (Bankr.N.D.N.Y.1985); 5 *Collier on Bankruptcy* ¶ 1113.01[i], at 1113–24 (15th ed. 1989); Cosetti & Kirshenbaum, *Rejecting Collective Bargaining Agreements Under Section 1113 of the Bankruptcy Code—Judicial Precision or

*Economic Reality?,* 26 Duq.L.Rev. 181, 225 (1987); Note, *Collective Bargaining Agreements in Bankruptcy Proceedings: Congressional Response to Bildisco,* 1985 U.Ill.L.Rev. 997, 1011–13. As stated by a Tenth Circuit panel of which the author of the concurring opinion was a member, "[w]hile new procedural requirements have been imposed, the approach to the required balancing of the equities should not be different from the instruction provided in *Bildisco*." *International Bhd. of Teamsters v. IML Freight, Inc.,* 789 F.2d 1460, 1461 (10th Cir. 1986).

## A. Effect of Proposals Which Allegedly Violate Labor Law

The Bankruptcy Code cuts across a broad spectrum of other areas of law in order to afford a debtor the opportunity to reorganize. The most pertinent example is section 1113 itself, which by providing for the rejection of collective bargaining agreements authorizes what would otherwise be a violation of 29 U.S.C. § 158(d). We recognize the strong national policies which protect workers from unfair labor practices and ensure the enforceability of collective bargaining agreements. *See* 29 U.S.C. § 158; *see also International Bhd. of Teamsters v. IML Freight, Inc.*, 789 F.2d 1460, 1462 (10th Cir.1986). But Chapter 11 of the Bankruptcy Code reflects an equally strong public policy "to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco*, 465 U.S. at 528, 104 S.Ct. at 1197.

■ "[W]hen an employer is in Chapter 11, the normal rules of labor law cannot be applied unqualifiedly but must be balanced by the policies of the Bankruptcy Code." Gibson, *The New Law on Rejection of Collective Bargaining Agreements in Chapter 11: An Analysis of 11 U.S.C. § 1113*, 58 Am.Bankr.L.J. 325, 342 (1984). We hold that a proposal containing modifications which, if implemented, would violate labor law does not *per se* fail to satisfy subpart (b)(1)(A), and does not relieve the union of its duty to confer in good faith. There may be cases where a necessary proposed modi-

fication is fair and equitable to all parties, even though it contravenes labor law.[3]

■ Conflicts between bankruptcy and labor law policies must be addressed case by case. The court shall balance any illegality against other considerations, but shall keep in mind that there must be a limit to permitting proposals which would violate labor law, both because of the nature of various substantive provisions of that law and because of the nature of section 1113 itself. The relief available to the debtor is rejection of an existing collective bargaining agreement, so a proposed modification should not make the debtor better off than it would be without any agreement. That is, proposals which would in and of themselves contravene labor law, even in the absence of a collective bargaining agreement, presumptively will not satisfy section 1113(b)(1)(A).

Section 1113 is intended to operate expeditiously. When the parties are unable to arrive at mutually satisfactory modifications, the bankruptcy court is entitled to use its own rules and procedures in addressing an allegation of illegality. The court should not await resolution of the question by the National Labor Relations Board[4] or conduct a full-scale trial. The bankruptcy court has no authority to adjudicate unfair labor practice claims.[5] It should simply take them into account in determining whether the debtor's proposed modifications satisfy section 1113(b)(1)(A).

■ Even though the burden of persuasion will rest with the debtor on the sub-

---

**3.** Without any proceedings below on the effects of the disputed provisions, this court would have to rely upon conjecture in order to decide whether this is such a case. That opinion would be merely advisory. *See Halder v. Standard Oil Co.*, 642 F.2d 107, 109 n. 1 (5th Cir. Apr. 1981). Federal courts do not issue advisory opinions. *FCC v. Pacifica Found.*, 438 U.S. 726, 735, 98 S.Ct. 3026, 3033, 57 L.Ed.2d 1073 (1978); *Montoya v. Postal Credit Union*, 630 F.2d 745, 749 (10th Cir.1980).

**4.** This will put the bankruptcy court in the disfavored position of evaluating laws in an area outside of its expertise, but consideration of other areas of the law is common in bankruptcy courts. Recent examples include *In re Lombardo Fruit & Produce*, 106 B.R. 593 (Bankr.E.D.

Mo.1989), applying the Perishable Agricultural Commodities Act, and *In re Brown*, 106 B.R. 852 (Bankr.E.D.Pa.1989), interpreting the Truth in Lending Act.

There also is a danger that a bankruptcy court will decide that a certain proposal is or is not illegal, then a subsequent NLRB decision will reach a different result. This risk is a necessary evil, though, for requiring the bankruptcy court to suspend its proceedings and await a decision of the NLRB would be unworkable.

**5.** The NLRB has exclusive jurisdiction over such matters, even during the reorganization process. *NLRB v. Superior Forwarding, Inc.*, 762 F.2d 695, 698 (8th Cir.1985); *NLRB v. Adams Delivery Serv.*, 24 B.R. 589, 592 (Bankr. 9th Cir.1982).

stantive requirements of section 1113, the union will bear the burden of production with regard to several of the elements. *In re American Provision Co.,* 44 B.R. 907, 909–10 (Bankr.D.Minn.1984). In particular, the union must come forward with evidence of a proposed modification's illegality, and the union's own good cause for rejecting the debtor's proposal on such grounds, before the burden of showing legality falls on the debtor.

■ Section 1113(b)(2) states that after the proposal is made, "the [debtor] shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications." We read this to require that both parties confer in good faith. In addition, subpart (c)(2) requires the union to have "good cause" for rejecting the proposal. These two subparts impose an obligation on the union to participate meaningfully in the negotiations and to explain its reasons for opposing the proposal. *Truck Drivers Local 807 v. Carey Transp., Inc.,* 816 F.2d 82, 92 (2d Cir.1987); *see In re Sol–Sieff Produce Co.,* 82 B.R. 787, 795 (Bankr.W.D.Pa.1988). Even if part of a proposal is unacceptable as a perceived unfair labor practice, the union must confer in good faith on the remainder of the proposal, and also must work with the debtor on the allegedly illegal provisions, explaining why the union deems them unlawful and negotiating changes or alternatives which would avoid the illegality.[6]

### B. The Requirement that the Modifications Be "Necessary"

Just what Congress meant when it used the word "necessary," which appears twice in section 1113(b)(1)(A), has been a source of confusion. In ordinary usage, "necessary" means "cannot be done without" or "absolutely required."[7] Relying on *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America,* 791 F.2d 1074, 1088 (3d Cir.1986), the district court held that a proposal which went beyond the bare minimum required for the debtor's reorganization did not satisfy section 1113(b)(1)(A). However, the majority of cases decided since *Wheeling–Pittsburgh* have declined to interpret section 1113(b)(1)(A) as requiring that a proposal[8] be absolutely necessary. *See, e.g., Truck Drivers Local 807 v. Carey Transp., Inc.,* 816 F.2d at 90; *In re Big Sky Transp. Co.,* 104 B.R. 333, 336 (Bankr.D.Mont.1989); *In re Texas Sheet Metals, Inc.,* 90 B.R. 260, 265 (Bankr.S.D.Tex.1988); *In re Amherst Sparkle Market, Inc.,* 75 B.R. 847, 851 (Bankr.N.D.Ohio 1987); *In re Walway Co.,* 69 B.R. 967, 973 (Bankr.E.D.Mich.1987).

---

6. The contested wage differential issue yields a perfect example of the Union's default in its obligation to negotiate in good faith. The Union stonewalled, but had there been true negotiations, the parties could have worked out a system under which new hires, whether or not Union members, would be paid less than current workers, and this would have been perfectly lawful. *See Truck Drivers Local 807 v. Carey Transp., Inc.,* 816 F.2d at 85.

We do not decide the proper consequences of a refusal to confer in good faith, but clearly some adverse consequence should befall an intransigent party. At the very least, a union's lack of participation should be considered when the court decides whether the union had good cause to reject the proposal, *id.* at 92; *In re Royal Composing Room, Inc.,* 62 B.R. 403, 407 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 671 (S.D.N.Y.1987), *aff'd,* 848 F.2d 345 (2d Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989), and whether the balance of equities favors rejection of the agreement. *In re Royal Composing Room, Inc.,* 848 F.2d at 349. Other responses may also be available to the bankruptcy court.

7. *Webster's Third New International Dictionary* 1511 (1981). *But see McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 414, 4 L.Ed. 579 (1819) ("The word 'necessary' has not a fixed character, peculiar to itself. It admits of all degrees of comparison.... A thing may be necessary, very necessary, absolutely or indispensably necessary."); *Black's Law Dictionary* 536 (abr. 5th ed. 1983).

8. This appeal does not present the question of whether section 1113(b)(1)(A) requires that *each* proposed modification be necessary to the reorganization, or merely that the proposal as a whole be necessary. We note only that the district court appeared to adhere to the former view, *see In re Mile Hi Metal Sys., Inc.,* 67 B.R. at 117, which is clearly the majority rule. *See, e.g., Truck Drivers Local 807 v. Carey Transp., Inc.,* 816 F.2d at 86; *In re Valley Kitchens, Inc.,* 52 B.R. 493, 497 (Bankr.S.D.Ohio 1985); *In re Fiber Glass Indus., Inc.,* 49 B.R. 202, 206 (Bankr.N.D.N.Y.1985). *But see In re Royal Composing Room, Inc.,* 848 F.2d at 349.

We agree with the latter view. The word "necessary" in subsection (b)(1)(A) does not mean absolutely necessary.[9] *In re Allied Delivery System Co.*, 49 B.R. 700, 702 (Bankr.N.D.Ohio 1985). We hold instead that section 1113(b)(1)(A):

> "places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully."

*Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d at 90. The goal to be served by modifying the collective bargaining agreement, and by the entire Chapter 11 proceeding, is not simply a reorganization, but a successful reorganization, i.e., one from which the debtor emerges as an economically viable operation. *See, e.g., Truck Drivers Local 807 v. Carey Transp., Inc.*, 816 F.2d at 89; *In re Walway Co.*, 69 B.R. at 973.

Of course, the debtor may not overreach under the guise of proposing necessary modifications. The proposals must be more than potentially helpful; they must be directly related to the debtor's financial condition.[10] *See In re William P. Brogna & Co.*, 64 B.R. 390, 392 (Bankr.E.D.Pa. 1986); *In re Valley Kitchens, Inc.*, 52 B.R. 493, 495–96 (Bankr.S.D.Ohio 1985); Gibson, *supra*, at 337; West, *Life After Bildisco: Section 1113 and the Duty to Bargain in Good Faith*, 47 Ohio St.L.J. 65, 112–13 (1986).

### C. Whether the Oral Statement Should Have Been Considered

The district court adopted the Union's position that the verbal reference to a wage differential between Union and non-Union replacement workers made by a Mile Hi representative during the hearing on Mile Hi's motion, R.Vol. IV at 38, was a separate proposed modification. *See In re Mile Hi Metal Sys., Inc.*, 67 B.R. at 117; Response Brief of Appellee at 8. It is clear from section 1113, however, that the proposal which the bankruptcy court is to evaluate must be made "prior to" the hearing. 11 U.S.C. § 1113(b)(1), (c)(1).

> "The court is to consider a debtor's proposal only to the extent the proposal was made prior to the commencement of the rejection hearing. It is only sensible that the court have a fixed point in time to look to as otherwise the court would be trying to deal with a constantly moving target as a debtor altered its proposal during the course of the trial."

*In re Royal Composing Room, Inc.*, 62 B.R. 403, 407 (Bankr.S.D.N.Y.1986) (citation omitted), *aff'd*, 78 B.R. 671 (S.D.N.Y. 1987), *aff'd*, 848 F.2d 345 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989). Therefore, the wage differential "proposal" was not properly before the court.

Of course, this does not mean that all statements made after the commencement of the rejection hearing must be disregarded. Statements explaining existing proposals are an important reason for having such a hearing. Only statements making new proposals are improper.

### III. CONCLUSION

Because of the incorrect interpretation and application of the statute by the courts

---

**9.** Differences in formulation notwithstanding, we believe that the standard proposed in the concurring opinion—that "the debtor must prove that reorganization will probably fail in short order absent such modification," *infra* at 897—would in practical effect be identical to the *Wheeling–Pittsburgh* standard. We decline to adopt it for the same reasons we choose not to follow *Wheeling–Pittsburgh*.

**10.** Another safeguard against overreaching is the fact that rejection of a collective bargaining agreement could give rise to a strike or other labor action which would actually decrease the likelihood of a successful reorganization. *See NLRB v. Bildisco & Bildisco*, 465 U.S. at 551, 104 S.Ct. at 1209 (Brennan, J., concurring in part and dissenting in part); Rosenberg, *supra*, at 303; Note, *Rejection of Collective Bargaining Agreements in Chapter 11 and the Possibility of Strikes: Tipping the Balance of Equities*, 15 N.Y. U.Rev.L. & Soc. Change 513, 539–40 (1986–87). It is therefore in the debtor's best interests to propose only modifications which the union will accept.

below, we vacate the judgment of the district court with directions that it vacate the order of the bankruptcy court and remand this case to the bankruptcy court for further consideration of Mile Hi's application to reject the collective bargaining agreement, and such other and further proceedings as may be appropriate in the circumstances, including the receipt of additional evidence and a further hearing if required. The bankruptcy court need not reopen specific findings and conclusions not affected by this decision.

Judgment VACATED, and the case is REMANDED.

SEYMOUR, Circuit Judge, concurring.

While I concur in the Court's decision to remand this case for further findings of fact, I write separately because I must take issue with the majority's construction of the term "necessary," with its discussion of illegal proposals, and with its suggestion that some "adverse consequence" should befall the union.

## I.

## NECESSARY

The majority correctly observes that in ordinary usage, the word "necessary" generally means "absolutely required." An initial reading of the statute, then, would suggest that a proposal "which provides

for those *necessary* modifications ... that are *necessary* to permit the reorganization of the debtor" should contain only essential modifications. 11 U.S.C. § 1113(b)(1)(A) (1988) (emphasis added). The majority rejects this reading of the statute, and instead adopts a more lenient construction which would apparently permit any proposal that increases the likelihood of a *successful* reorganization.[1]

The majority's rationale for rejecting the common reading of "necessary" and following the Second Circuit's construction consists of conclusory statements, not arguments. The majority simply notes that necessary can be read a variety of ways[2] and then, ignoring the strong labor law policy favoring stable collective bargaining agreements, adds that giving the debtor more leniency to cut costs at the expense of organized labor will better ensure that the debtor's reorganization is a successful one.[3]

The fact that necessary *can* be construed in a number of different ways begs the question of how the word *should* be construed. The majority avoids addressing the problem of multiple interpretation, insisting instead that the Court must "confine [its] analysis ... to the words of the statute itself" and must refrain from using a legislative history it describes as "little more than self-serving statements by op-

1. *See* Opinion at 893, following *Truck Drivers Local 807 v. Carey Transp., Inc.,* 816 F.2d 82, 90 (2d Cir.1987). *See also New York Typographical Union No. 6 v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.),* 848 F.2d 345, 348 (2d Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989).

2. The majority also asserts that its position is consistent with "the majority of cases." *See* Opinion at 892. I find it surprising that the majority so easily finds that a majority rule exists. Only two circuits have addressed this issue and they have reached opposing results. The Third Circuit adheres to a strict reading of "necessary," *see Wheeling–Pittsburgh Steel Corp. v. United Steelworkers,* 791 F.2d 1074 (3d Cir. 1986), while the Second Circuit has adopted the more lenient approach. *See Carey Transp., Inc.,* 816 F.2d 82; *In re Royal Composing,* 848 F.2d 345. Such a split contradicts the assertion that there is any kind of clear majority rule.

3. *See* Opinion at 893. The assumption that a more lenient standard will improve the chances for a debtor's successful reorganization may be ill-founded. At least one commentator, and the dissenting justices in *Bildisco,* have concluded that such leniency may lead to "strikes, boycotts, [and] walk-outs" and hence "'decrease the prospects for a successful reorganization.'" Rosenberg, *Bankruptcy and the Collective Bargaining Agreement—A Brief Lesson in the Use of the Constitutional System of Checks and Balances,* 58 Am.Bankr.L.J. 293, 303 (1984).

In addition, I fail to see how limiting the debtor to proposed modifications that "directly relate ... [to its] financial condition," Opinion at 893, protects the union in any way; it is precisely this indiscriminate ability of debtors to suggest modifications designed to enhance their own financial position that section 1113 was designed to prevent.

posing partisans." *See* Opinion at 890.[4] But when there is such a range of possible interpretations, to "confine" oneself to the "words of the statute" does not shed any light on the meaning of those words. As the majority so aptly notes in its opinion, Chief Justice Marshall once observed:

> "The word 'necessary' ... has not a fixed character, peculiar to itself. It admits of all degrees of comparison ... A thing may be necessary, very necessary, absolutely or indispensably necessary."

*McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 414, 4 L.Ed. 579 (1819) (interpreting the "necessary and proper" clause of the Constitution). A strict plain language analysis of section 1113 therefore must give way to other methods of interpretation so that Congress' intent behind the use of the word necessary may be understood.

Looking first at the structure of the statute for interpretative assistance, the repetition of "necessary" in section 1113(b)(1)(A) emphasizes that word and thus suggests that Congress did not envision a lenient interpretation. Senator Packwood stressed this point, noting that

> "[t]he word 'necessary' inserted twice into this provision clearly emphasizes this required aspect of the proposal which the debtor must offer."

130 Cong.Rec. S8898 (daily ed. June 29, 1984).[5]

At the other end of the spectrum, an extremely strict interpretation of necessary seems equally inconsistent with the statutory language since if all proposed modifications must be *absolutely* necessary, then the duty imposed by section 1113(b)(2) to negotiate in good faith becomes an impossibility.[6] An examination of the structure of the statute therefore does not clearly reveal what was meant by "necessary."

The statute's legislative history, the majority correctly notes, consists of contradictory floor statements by members of the House and Senate. No explanatory Committee Reports were issued.[7] This legislative history thus provides only murky insight into Congress' intent. The majority errs, however, by failing to move beyond this particular legislative history and examine the context in which section 1113 was passed, for it is the context in which words are uttered or written that defines the parameters of their meaning.[8]

Congress enacted The Bankruptcy Amendments and Federal Judgeship Act of 1984, of which section 1113 is a part, *see* Pub.L. No. 98–353, § 541, 98 Stat. 333, 390–91 (codified at 11 U.S.C. § 1113 (1988)), in direct response to labor concerns about employers' tactical use of bankruptcy laws and in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). *See 2 Collier on Bankruptcy,*

---

**4.** The majority does acknowledge that analysis of the statutory language should "tak[e] into account other judicial interpretations." Opinion at 890. But where, as in this case, there is such a clear split among the courts, some interpretive tool is needed to help decide from among them.

**5.** The repetition of the word necessary also may be seen as emphasizing "the requirement of the debtor's good faith in seeking to modify its existing labor contract." *Century Brass Prod., Inc. v. International Union, United Automobile Workers (In re Century Brass Prod., Inc.),* 795 F.2d 265, 273 (2d Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986).

**6.** In *Carey Transportation,* the court pointed out that

> "[b]ecause the statute requires the debtor to negotiate in good faith over the proposed modifications, an employer who initially proposed truly minimal changes would have no room for good faith negotiating, while one

who agreed to any substantive changes would be unable to prove that its initial proposals were minimal."

816 F.2d at 89 (citations omitted).

**7.** The majority attributes this omission to an inability to reach an agreement. In fact, the speed with which the bill was enacted accounted for the lack of Committee Reports. *See* Note, *Rejection of Collective Bargaining Agreements by Chapter 11 Debtors: The Necessity Requirement Under Section 1113,* 21 Ga.L.Rev. 967, 983 (1987); Rosenberg, 58 Am.Bankr.L.J. at 318–19; Note, *The Rejection of Collective Bargaining Agreements in Chapter 11 Reorganizations: The Need for Informed Judicial Decisions,* 134 U.Pa.L.Rev. 1235, 1241–42 (1986).

**8.** *See McCulloch,* 17 U.S. at 415 ("in [a word's] construction, the subject, the context, the intention of the person using them, are all to be taken into view").

§ 365.03 at 365–22 (15th ed. 1989). In *Bildisco*, the Court unanimously held that

> "the Bankruptcy Court should permit rejection of a collective-bargaining agreement ... if the debtor can show that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract."

*Id.* at 526, 104 S.Ct. at 1196. The Court also held, by a five-to-four margin, that the National Labor Relations Board may not find a debtor-in-possession guilty of an unfair labor practice when it has "unilaterally breach[ed] a collective-bargaining agreement before formal Bankruptcy Court action." *Id.* at 534, 104 S.Ct. at 1200.

The *Bildisco* decision was handed down in February 1984, and it sparked extensive lobbying by representatives of both organized labor and management. *See* Ritchey, *Rejection of Collective Bargaining Agreements: Section 1113*, 4 Bankr.Dev.J. 171, 172 (1987); Rosenberg, 58 Am.Bankr.L.J. at 312–16. Lobbying efforts by labor interests actually had predated *Bildisco*. Labor first aired its concerns in the fall of 1983 at a hearing before the Labor–Management Relations and Labor Standards Subcommittees of the House Education and Labor Committee. In that hearing, six airline unions testified that employers, freed from the requirement that they be insolvent before filing for protection under Chapter 11,[9] were "improperly using federal bankruptcy law as a 'new collective bargaining weapon.'" Rosenberg, 58 Am.Bankr.L.J. at 312. Furthermore, companies' use of bankruptcy as a convenient means to reject labor contracts was a trend that extended far beyond the airline industry, and perhaps accounted in part for the 220 percent increase in business bankruptcy cases from 1978 to 1982. *Id.* at 304–05.

The Supreme Court ruling also prompted the introduction by Congressman Rodino of a bill in the House,[10] and later of two bills in the Senate, one sponsored by Senator Packwood and the other by Senator Thurmond. The labor-supported *Rodino* measure, which effectively incorporated the strict *REA Express* standard,[11] passed the House. The Senate, meanwhile, was reluctant to choose between the pro-labor Packwood and the pro-management Thurmond bills,[12] and so it did not decide the collective bargaining agreement issue but instead left it up to the conference committee to solve the dilemma. What finally emerged was a compromise measure that "cuts a middle line" between the stricter and the more lenient standards for rejection.[13] 2 *Collier on Bankruptcy*, § 365.03 at 365–26. With section 1113, Congress thus responded to *Bildisco*[14] and created a stan-

---

9. The Bankruptcy Reform Act of 1898 required an insolvency showing; the Bankruptcy Reform Act of 1978 eliminated this requirement.

10. *See* H.R. 4908, 98th Cong., 2d Sess., 130 Cong.Rec. H809 (daily ed. February 22, 1984). Congressman Rodino later introduced a modified version of the bill, and it was the modified version that the House passed. *See* H.R. 5174, 98th Cong., 2d Sess., 130 Cong.Rec. H1727 (daily ed. March 19, 1984).

11. *See Brotherhood of Ry. Clerks v. REA Express, Inc.*, 523 F.2d 164, 172 (2d Cir.), *cert. denied*, 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975), and 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 82 (1976):

> "rejection ... should be authorized only where it clearly appears to be the lesser of two evils and that, unless the agreement is rejected, the carrier will collapse and the employees will no longer have their jobs."

12. *See* Rosenberg, 58 Am.Bankr.L.J. at 318 ("it became clear that the members of the Senate were looking for a compromise so that they would not be viewed as having cast a vote for or against anyone").

13. *REA Express* embodies the strictest end of the rejection-standard spectrum, while the so-called "business judgment test," which applies to ordinary executory contracts, occupies the other end. *See, e.g., In re W. & L. Assoc., Inc.*, 71 B.R. 962, 966 (Bankr.E.D.Pa.1987), where the court explained the test:

> "We do not consider the 'business judgment test' to be a strict standard to meet. Rather, the test merely requires a showing by the ... Debtor-in-Possession that rejection of the contract will be likely to benefit the estate."

14. The majority contends that I have buried *Bildisco* too quickly since section 1113 only "created new procedural requirements." Opinion at 5 n. 2. Of course, it is precisely the procedural requirement that the debtor "make a proposal ... which provides for necessary modifications ... necessary to permit ... reorganization" that is at issue in this case.

The majority cites to *In re Fiber Glass Industries, Inc.*, 49 B.R. 202, 203 (Bankr.N.D.N.Y.

dard that "is a high one although ... [it] does not rise to the level of the 'financial collapse' test of *REA Express*." *Id* at 365–25.

Viewing the plain language, the statutory structure, and the context together, it becomes apparent that Congress intended neither that "necessary" should be taken to mean absolutely necessary, nor that it should be interpreted as merely convenient. Instead, a reading of "necessary" must reflect the compromise achieved and must balance the pro-collective bargaining policies of the National Labor Relations Act with the goals of reorganization.[15] Any proposed modification to a collective bargaining agreement should therefore be reasonably necessary; that is, while it need not be essential to prevent financial collapse, the debtor must prove that reorganization will probably fail in short order absent such modification.[16]

## II.

## ILLEGAL PROPOSALS

In its discussion of allegedly illegal proposals, the majority concludes, as did the district court, that a bankruptcy court should consider labor law violations "case by case ... [and] balance any illegality against other considerations." Opinion at

891. While I agree with the language of this standard, I find the balancing suggested problematic. The majority cites *Bildisco* to stand for the proposition that Chapter 11 represents a strong policy favoring flexibility for the debtor to reorganize. Of course, as noted above, section 1113 represents Congress' reaction *against* the *Bildisco* decision. Proposals alleged to constitute an unfair labor practice, therefore, must be considered in this context.

## III.

## ADVERSE CONSEQUENCE

The majority concludes that the good faith language of section 1113(b)(2), read with the "good cause" language of section 1113(c)(2), creates an affirmative duty on the part of the union to participate meaningfully in negotiations. The majority further states that the union in this case "stonewalled" in negotiations, and suggests that the bankruptcy court should consider imposing some "adverse consequence" on a party who so "stonewalls". *See* Opinion at 892 n. 6. The majority ignores the fact that while management took no salary cuts, the union made numerous wage and other concessions prior to the Mile Hi's Chapter 11 filing. *See* Rec., Vol. IV, at 42–48. In my view, the sugges-

1985), and to 5 *Collier on Bankruptcy*, § 1113.01[i] at 1113–24 (15th ed. 1989), in support of its contention that section 1113 codified *Bildisco*'s substantive standards. I am unable to find the basis for the majority's assertion, however, since the court in *Fiber Glass* stated only that "Congress ... adopt[ed] *in substantial part* the test ennunciated by the Supreme Court." *Fiber Glass*, 49 B.R. at 203 (emphasis added). I do not believe that "substantive standards" and "in substantial part" mean the same thing. And *Collier on Bankruptcy* correctly observes that "the balancing of equities test espoused by the Supreme Court in the *Bildisco* decision [was] incorporated by Congress in section 1113." 5 *Collier on Bankruptcy*, § 1113.01[i] at 1113–24. *See* § 1113(c)(3). Of course, Congress not only added the balance of the equities language, but also the prior requirement of "necessary modifications." It is this latter substantive standard, a standard *not* espoused by the Supreme Court in *Bildisco*, that this court has been called upon to interpret.

Finally, the majority cites to our dicta in *International Brotherhood of Teamsters v. IML*

*Freight, Inc.*, 789 F.2d 1460, 1461 (10th Cir. 1986), where we also noted the recently enacted change in procedural requirements. However, our reference there was clearly to the balancing-of-equities test, not the "necessary modifications" requirement added by Congress.

The majority also fails to note that in *IML Freight* we go on to emphasize that

"the special nature of labor contracts is rooted in the national policy which favors collective bargaining in employment and that Congress has strongly cautioned the bankruptcy courts to be considerate of that policy."

*Id.* at 1462.

**15.** For one opinion analyzing the legislative history and interpreting section 1113 as "a pro-labor law," *see In re Royal Composing*, 848 F.2d at 353 (Feinberg, C.J., dissenting).

**16.** I agree with the majority that the debtor bears the burden of proof on the necessity requirement. Opinion at 891; *see In re American Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn. 1984).

tion that an "adverse consequence" should befall the union in these circumstances is inappropriate.

## IV.

## CONCLUSION

The speed with which Congress enacted section 1113 has left courts in an awkward position. With respect to the word "necessary," Congress' failure to set out a clear legislative history through committee reports has resulted in widely divergent judicial interpretations of Congress' intent.

Even more troubling is a glaring omission: there is no discussion by Congress of how to deal with conflicts between bankruptcy and labor laws. Specifically, Congress has given courts little guidance on handling situations in which a union argues that the company-proposed modifications to a collective bargaining agreement would constitute an unfair labor practice. Congress thus has left us hanging.

On the merits of this case, I agree with the majority that the case must be remanded to the bankruptcy court for further proceedings. Contrary to the majority, I would instruct the bankruptcy court to apply an interpretation of "necessary" that reflects Congress' rejection of the lenient *Bildisco* standard in favor of a more stringent test. In evaluating the necessity of the proposed modifications, the bankruptcy court should assess both the need for the suggested wage cuts for union members and whether alternatives existed to such cuts. Additionally, the court should consider whether modifications that arguably violate labor laws constitute "good cause" for the union to refuse to negotiate or whether they undercut Mile Hi's assertion that the proposed changes are "fair and equitable."