**In the Matter of WALWAY COMPANY,
a Michigan corporation, Debtor.**

**Bankruptcy No. 86–03861–G.**

United States Bankruptcy Court,
E.D. Michigan, S.D.

Feb. 13, 1987.

Thomas B. Radom, Butzel Long Gust Klein & Van Zile, Birmingham, Mich., for debtor.

Michael B. Nicholson, Associate Gen. Counsel, Intern. Union, UAW, Detroit, Mich.

## AMENDED OPINION AND ORDER GRANTING DEBTOR'S MOTION TO REJECT THE COLLECTIVE BARGAINING AGREEMENT

RAY REYNOLDS GRAVES, Bankruptcy Judge.

The Debtor, Walway Corporation, is a wholly-owned subsidiary of a holding company, CWN. On August 6, 1986 Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As of the filing date, Debtor was a party to a collective bargaining agreement ("contract") dated July 26, 1985, with Local 985

of the International Union of United Automobile Aerospace and Agricultural Implement Workers of America ("union"). The term of this contract is to expire on November 17, 1988.

Subsequent to the petition in bankruptcy, the Debtor and the Union engaged in discussion to modify the contract in light of the Debtor's financial condition. The Debtor made a proposal for modification of the contract. The Union, after examining the Debtor's books and records and meeting frequently on the matter, made a counter proposal. While we do not state the specifics of each proposal on the record, it is important to note two facts: (1) the proposals were extremely different in the kind and amount of concessions to be made; and (2) no agreement between the parties was ever reached.[1] During the negotiations, the Debtor and Union discussed a "snap-back" provision that would allow the union to enjoy the benefits of a profitable company in the future. The offer of a snap-back provision was rejected by the Debtor.

After further meetings and discussions, the parties were unable to reach an agreement.[2]

Subsequently, the Debtor filed an Application to Reject the Collective Bargaining Agreement pursuant to 11 U.S.C. § 1113. The Union filed a responsive brief.

We are called upon to resolve the following issues:

(1) Whether this Court can exercise jurisdiction over the non-debtor parent company, CWN, allowing us to consider its resources in the attempt to reject the collective bargaining agreement and reorganize the company?

(2) Whether Debtor has fulfilled the requirements of 11 U.S.C. § 1113, and offered proof sufficient under that section to warrant rejection of the collective bargaining agreement?

## THE ASSETS OF THE NON–DEBTOR ENTITY CANNOT BE CONSIDERED UPON AN APPLICATION UNDER § 1113

■ A "debtor" is defined as a person or municipality concerning which a case under Title 11 has been commenced. 11 U.S.C. § 101(12).[3] It is fundamental that a bankruptcy court has jurisdiction over a debtor under Chapter 11. See 28 U.S.C. §§ 1334 and 157. If a corporation does not have a

---

1. We will not burden the text with the particulars of each proposal. However, since labor contract disputes are chiefly based upon differences in contract proposals, we will give the specifics here:

THE DEBTOR'S PROPOSAL

A. Article X, Section 1—$2.00 an hour reduction in hourly wages for all production employee classifications;

B. Article X, Section 4—elimination of the following paid holidays: Martin Luther King's birthday, Good Friday, day after Thanksgiving, and Christmas holiday period for days December 26 through December 31;

C. Article X, Section 10—elimination of group life and accidental death and dismemberment insurance;

D. Article XI, Section 1—reduction in vacation pay as follows:
less than 2 years–2% of straight time earnings, in lieu of 3% of gross earnings, less vacation and holidays;
2 years but less than 10 years–4% of straight time earnings, in lieu of 6% of gross earnings for 2 years but less than 5 years and 7% of gross for 5 years but less than 10 years, less vacation and holidays;

10 years and over–6% of straight time earnings in lieu of 8% of gross earnings, less vacation and holidays.

THE UNION'S PROPOSAL

1. $1.00 an hour in the production employee classifications.

2. elimination of only two paid holidays, namely Good Friday and the day after Thanksgiving;

3. no change in insurance coverage for group life and accidental death and dismemberment;

4. 1% across-the-board reduction in vacation pay but still calculated on gross earnings; and

5. immediate payment of outstanding vacation pay in the amount of $60,798.00 due employees.

2. It is important to note that this court has continuously encouraged the parties to negotiate even while this case was being tried. The very nature of the case at bar indicates that the parties should try to reach an accord. Good faith bargaining is the cornerstone of labor contract negotiations.

3. Correspondingly, "person" includes corporations and partnerships. 11 U.S.C. § 101(33).

case commenced against it, then it is not a debtor and the court has no jurisdiction. In the case at bar, we are asked to exercise jurisdiction over the assets of a non-debtor company in the disposition of the pending motion. Such action would exceed the limits of our authority.[4] See *In re Wayne*, 55 B.R. 615 (Bankr.N.D.Texas 1985); and *In re General Oil Distributors, Inc.*, 21 B.R. 888 (Bankr.E.D.N.Y.1982). (Holding that a court as a general rule cannot exercise jurisdiction over a non-debtor).

The union argues that the close relationship between the parent to the sub grants jurisdiction over CWN. The evidence is to the contrary. The two companies have been kept separate and are identifiable entities within the strictures of corporate formalities. CWN and the Debtor filed joint tax returns in the past; however, this action taken for tax advantages and efficiency is not in and of itself sufficient for this Court to exercise jurisdiction over the parent company. Ideally, the Union could have sought a motion for substantive consolidation to resolve these issues before the disposition of the present motion.[5] See generally, *Matter of Evans Temple Church of God in Christ and Community Center Inc.*, 55 B.R. 976 (Bankr.N.D.Ohio 1986); *In re Silver Falls Petroleum Corp.*, 55 B.R. 495 (Bankr.S.D.Ohio 1985). Absent a finding that as a matter of law the companies should be consolidated, this Court cannot exercise jurisdiction over the non-debtor CWN.[6]

**4.** The Court sustained Debtor's motion limiting the Union's examination of witnesses in the area of CWN's assets as possible resource for the failing Debtor company.

**5.** It is necessary to state that we make no ruling today on the Union's pending motion for substantive consolidation. We state only that the evidence presented in this proceeding does not persuade us that the two companies should be treated as one.

**6.** Michigan has an extensive body of law dealing with corporate formalities and corporate practices. A court that hastily exercises jurisdiction over a non-debtor company runs a considerable risk of frustrating the purpose of this law, as well as trampling upon state law in general. See M.C.L.A. § 450.1101 et seq.

**THE DEBTOR HAS FULFILLED THE REQUIREMENTS OF § 1113 AND GIVEN SUFFICIENT PROOF THAT THE CONTRACT SHOULD BE REJECTED**

The rejection of a collective bargaining agreement is now controlled by 11 U.S.C. § 1113. Prior to § 1113, collective bargaining agreements were treated under § 365 as "executory contracts".[7] *Borman's Inc. v. Allied Supermarkets*, 706 F.2d 187 (6th Cir.1983); *cert. denied*, 464 U.S. 908, 104 S.Ct. 263, 78 L.Ed.2d 247 (1983); *In re Brada Miller Freight Systems*, 702 F.2d 890 (11th Cir.1983); *Local Joint Executive Board v. Hotel Circle*, 613 F.2d 210 (9th Cir.1980). Under this procedure, there was a dispute among the circuits as to the proper standard to be employed. Many courts felt that the special case of labor contracts gave rise to concerns necessitating treatment that could not be provided by § 365.[8]

The issue of what standard to apply was resolved in *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). In *Bildisco* the Court agreed that § 365 did apply to collective bargaining agreements, but that the nature of the contract involved gave rise to the need for a special standard.[9] The Court held that a bankruptcy court may allow rejection of a collective bargaining agreement if the debtor can show: (1) that the contract burdens the estate; and (2) that after careful scrutiny the equities balance in favor of rejec-

**7.** 11 U.S.C. § 365(a) states that "[T]he trustee, subject to the court's approval, may assume or reject any executory contract of the Debtor."

**8.** For a discussion, see Bordewieck and Countryman, *The Rejection of Collective Bargaining Agreements by Chapter 11 Debtors*, 57 Am. Bankr.L.J. 293 (1983); Pullman, *The Rejection of Collective Bargaining Agreements under Section 365 of the Bankruptcy Code*, 58 Am.Bankr. L.J. 1 (1984); and *Eight Circuit Survey: The Accommodation of the Bankruptcy and Labor Acts in Chapter 11 Reorganizations*, 16 Creighton L.Rev. 859 (1983).

**9.** In other cases, the "business judgment test" was employed. See *Group Inst. Investors v. Chicago Mil. St. P. & Pac. R.R.* 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943).

tion. *Bildisco,* 465 U.S. at 513–526, 104 S.Ct. at 1189–96.[10] Moreover, the Court stated that in balancing the equities the bankruptcy court is not allowed "free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization". Id.

**10.** The court in so holding expressly adopted the Standard of the Second Circuit in *Shopmen's Local Union No. 455 v. Kevin Steel Products,* 519 F.2d 698 (2d Cir.1975).

**11.** It is interesting to note, that while Congress was considering legislation pursuant to *Bildsco,* that it was also repairing the jurisdictional defects of the Bankruptcy Court caused by *Northern Pipeline Construction Company v. Marathon Pipeline Company,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). Labor organizers were quick to point out that the Supreme Court held that the Bankruptcy Court's broad jurisdictional grant was unconstitutional and then gave that same court the important authority to reject labor contracts. For an excellent discussion regarding this phenomenon see Countryman, *Scrambling to Define Bankruptcy Jurisdiction,* 22 Harv.J. on Legis. 1 (1985); and West *Life After Bildisco, Section 1113 and the Duty to Bargain in Good Faith,* 47 Ohio St.L.J. 65 (1986) at 104–105.

**12.** Section 1113 reads in full:

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of the proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assure that all creditors, the debtor, and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3) the representatives of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the

*11 U.S.C. § 1113*

After *Bildisco,* Congress passed legislation concerning the rejection of labor contracts in bankruptcy.[11] The result was 11 U.S.C. § 1113 [12] which included four important provisions:

(1) the employer cannot unilaterally terminate the contract, and it remains in

hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

(d)(1) Upon the filing of an application for rejection, the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. The court may extend the time for the commencement of such hearing for a period not exceeding seven days where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.

(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interest of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to. If the court does not rule on such application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees' representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.

(3) The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

(e) If during a period when the collective bargaining agreement continues in effect, and if

effect during the bankruptcy. § 1113(f).

(2) the Court can approve interim changes pending the disposition of a § 1113 motion. § 1113(e).

(3) a debtor must propose modifications to the contract prior to the application. § 1113(b)(1)(A).

(4) adoption of the "balance of the equities test" with minor modifications. § 1113(c)(3).[13]

After the passage of § 1113, courts have found nine statutory requirements necessary for rejection of a labor contract under that section. In *Matter of American Provision*, 44 B.R. 907 (Bankr.D.Minn.1984) the court stated these factors as follows:

1. The debtor must make a proposal to the union to modify the collective bargaining agreement;

2. The proposal must be based on the most complete and reliable information available at the time of the proposal;

3. The proposed modifications must be necessary to permit the reorganization of the debtor;

4. The proposed modifications must assure that all creditors, the debtor and all the affected parties are treated fairly and equitably.

5. The debtor must provide the union such relevant information as is necessary to evaluate the proposal;

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining

agreement, the debtor must meet at reasonable times with the union;

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement;

8. The union must have refused to accept the proposal without good cause; and

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

Each requirement must be fulfilled in order to reject a contract. See *In re Kentucky Sales Inc.*, 52 B.R. 797 (Bankr.W.D.Ky. 1985); *In re Carey Transportation Inc.*, 50 B.R. 203 (Bankr.S.D.N.Y.1985). For the sake of thoroughness, we will examine each requirement separately.[14]

### 1. Debtor made a proposal to modify the contract.

It is unrefuted that the Walway Company after reviewing its financial difficulties, made an offer to the union to modify the collective bargaining agreement. In accord with § 1113(b)(1)(A), the offer was made after petition but before the application for rejection was filed.

### 2. The Proposal was based on the most complete and reliable information available.

The testimony of John Walton, President of Walway, persuades us that the financial records of the company were accurate and current. This information was analyzed and later used to form the modification proposal to the union.

---

essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.
(f) No provision of this title shall be construed to permit a trustee to unilaterally termi-

nate or alter any provisions of the collective bargaining agreement prior to compliance with the provisions of this section.

**13.** For a full discussion of these four requirements, please see West, *Life After Bildisco Section 1113 and the Duty to Bargain in Good Faith.* 47 Ohio St.L.J. 65 (1986). 106, 118.

**14.** For our purposes, requirements four, eight and nine as numbered in *American Provision* will be analyzed together as we feel they are interrelated.

3. The proposed modifications must be necessary to permit the debtor to reorganize.

The requirement of "necessity" was the subject of much debate during the trial. Each party has given its own narrowly defined interpretation of "necessity" under § 1113. Case law supports the conclusion that "necessary" means a modification that will result in a greater probability of a successful reorganization than if the contract were allowed to continue in force. *In re Valley Kitchens Inc.,* 52 B.R. 493 (Bankr.S.D.Ohio 1985). Moreover, we disagree with the Union that a different standard of "necessity" is required under the Third Circuit's analysis in *Wheeling-Pittsburgh Steel Corp., v. United Steelworkers of America,* 791 F.2d 1074 (3rd Cir.1986). In *Wheeling* the Court stated clearly that "necessity" referred to "minimum modifications that would permit the reorganization ... modifications that the trustee is compelled to accept because they are directly related to the company's financial condition and its reorganization." *Wheeling-Pittsburgh* at 1088. The Third Circuits' view of "necessity" is not one that is related to the certain prosperity of the company, but rather it concerns giving the debtor a better opportunity to reorganize and become profitable again. In the case at bar, the Debtor has shown that cost-saving cuts have been made in other areas, and that these measures did not increase the company's chances of survival. The last measure sought by the Debtor was the modification of the labor contract.[15] The evidence is persuasive that if the contract is modified that Walway's chances of reorganization and return to profitability are far greater.

4. The Debtor must provide the Union with such relevant information as is necessary to evaluate the proposal.

It is not disputed that Walway opened all of its financial books and records to the Union. The Court in *American Provision* noted that this important requirement is closely related to requirement number two that the Debtor base its proposal on relevant information. *American Provision,* at 909. This requirement protects the Union's right to evaluate the accuracy of the Debtor's proposal and structure their own. The record establishes that the Union was supplied with all of the relevant information for those purposes.

5. Between the time of making the proposal and hearing, the Debtor and the Union must meet at reasonable times.

To the credit of both parties in this case, negotiations have been frequent. Each side has indicated to this Court that after many meetings, neither settlement nor compromise was reached. The majority of these meetings occurred between the filing of the petition and a hearing on the matter. Neither side has indicated that contact with the other was insufficient in any way.

6. Debtor must act in good faith in its attempt to reach an agreement.

Good faith bargaining is conduct indicating an honest purpose to arrive at an agreement as the result of the bargaining process. *Cap Santa Vue Inc., v. N.L.R.B.,* 424 F.2d 883 (C.A.D.C.1970); 137 U.S.App. D.C. 395 (1970). See also, NLRA § 8(d), 29 U.S.C. § 158(d) (1982). The Debtor met numerous times with the Union to engage in discussions. Debtor even provided the Union with a comparative cost analysis to show the negative impact of the Union's proposal on the viability of the business. We find that the Debtor's conduct at all times during the negotiations conformed to the requirement of good faith.

7. The Proposal must treat all parties equitably, the Union must have rejected the proposal without good cause and a balance of the equities must favor rejection.

Under the *American Provision* analysis, requirements four, eight and nine are relat-

---

**15.** We feel that this fact is significant. In most cases, a financially troubled company should consider rejection of a labor contract a last resort to help the company survive. The history of the collective bargaining agreement and its special treatment and protection lends support to this conclusion. See note 20 *infra* and accompanying text.

ed. In this theory, "good cause" and equity are related to "necessity". The legislative history of § 1113 indicates that "good cause" is not a barrier to rejection if the proposal contains the specified "necessary" modifications. 130 Con.Rec. S8898 (daily ed. June 29, 1984) (Remarks of Senator Packwood). A modification that does not treat all parties fairly and equitably fails the test of § 1113 for rejection, and can give a debtor cause to reject a proposal. See *American Provision*, 44 B.R. at 910, 911. Therefore, under § 1113, a modification that is not "necessary" by statutory standards, or that is inequitable provides "good cause" for rejection of that proposal.[16]

We find the proposed modification was necessary pursuant to § 1113. Is the modification, however, equitable and does a balance of those equities favor rejection? The Union argues that the cost-cutting measures taken by the Debtor have been unfair and have a disporportionate impact on the union workers. The presented evidence indicates, however, that John Walton, President of the Debtor has taken substantial financial concessions and is personally liable on loans to the company. The Union argues that these cost-cutting measures are not equal to the concessions made by the union workers. Equity, however, under § 1113 means fairness under the circumstances, not a comparative dollar-for-dollar concession. See *In re Allied Delivery System*, 49 B.R. 700, 703 (Bankr. N.D.Ohio 1985). An analysis of the Debtor's and Union's proposal in light of cost-cutting measures and Mr. Walton's own personal sacrifices indicates that the proposal is equitable.

Further, the union argues an inbalance of the equities based upon Debtor's rejection of a "snap-back" proposal. A snapback is an agreement which provides that once a debtor company is again profitable, then the terms and benefits to the Union will "snap-back" to the original, or a modified state. There is no authority that requires such a proposal be accepted.[17] It is logical that a union that shares in the hardship of a company should also share in its prosperity. The *Wheeling Pittsburgh* court thought that it was incumbent upon judges to at least consider the absence of a snap-back provision as it relates to equity. *Wheeling-Pittsburgh*, 791 F.2d at 1091, 1092. We agree that the consideration of a snap-back provision relates to fairness. We disagree that the acceptance of such a proposal is mandatory or that the absence of a consideration of such will always tip the balance of equity against rejection. In the case at bar, the rejection of the snap-back provision is not an indication of inequitable treatment or result. The Third Circuit in *Wheeling-Pittsburgh* thought that the Debtor's "worst-case" projection of future profitability gave rise to the necessity to consider the snap-back provision. *Id.* at 1090. Conversely, Walway's projection of company recovery is based upon a "best-case" analysis. There is no unfairness in this result. The Debtor considered the proposal and decided against it based upon the condition of the company and a projected recovery. In light of the record, we find the Debtor has proven by clear and convincing evidence that the equities balance in favor of rejection.[18] See *In re K & B*

---

**16.** Theoretically, the failure of any of the other eight requirements can be "a good cause" for rejection. We find relation between good cause, necessity and equity because these three requirements are the most important of the nine requirements of *American Provision* and § 1113.

**17.** Arguably, the requirement of a snap-back would defeat the purpose of § 1113. If it is required that the original terms of a contract must be implemented when a company is back on its financial feet, then rejection of a labor contract becomes unnecessary. Debtors and Unions under this theory would only need to modify the agreement contingent upon the company returning to profitability and at that time the original (or modified) terms of the contract would come into force. Rejection of a contract cancels it, and the parties must begin at square one.

**18.** § 1113(b)(3) states that "a balance of the equities should *clearly* favor rejection. This choice of wording gives rise to a higher standard of proof for balancing equities than the preponderance required for the rest of § 1113. See *In re Century Brass Products Inc.*, 795 F.2d

*Mounting Inc.,* 50 B.R. 460 (Bankr.N.D. Ind.1985) (requiring that a balance of the equities be proven by clear and convincing evidence.)

Because the proposal was necessary and equitable pursuant to § 1113, the Union's rejection of the modification was without good cause.

The Debtor bears the burden of proof on an application under § 1113. *In re Century Brass Products Inc.,* 795 F.2d 265 (2d Cir.1986); *In re Kentucky Truck Sales,* 52 B.R. 797 (Bankr.W.D.Kentucky 1985). Proof of the nine requirements must be by a preponderance of the evidence.[19] See *American Provision,* 44 B.R. at 909. In the instant case, the debtor has adequately met its burden. The evidence presented persuades us that the operation of § 1113 in this case moves for rejection of the labor contract.

We feel compelled to discuss the importance of our action today as it relates to the special nature of the collective bargaining agreement under the authority of the bankruptcy court. The history of the labor contract is a journey through one of the most important movements of recent times.[20] This history has elevated the labor contract to an almost revered status in our society. Livelihoods are bound within the dynamics of a collective bargaining agreement. The legislative history and construction of § 1113 seek to protect these important concerns.[21] It is clear that § 1113 was intended to benefit the Union as well as the Debtor. It is based upon the simple but logical notion that in light of a failing business, employment that yields lesser benefits is preferable to no employment at all. If a company is saved by § 1113, then everyone has benefitted. We

are not sure that the company here will survive even if the contract is rejected. However, the evidence presented indicates that there is a much better chance of reorganization and survival if the labor contract is modified.

We, therefore, GRANT Debtor's motion in the hope that the parties can come to a mutually satisfactory agreement that will be of benefit to all concerned.

---

265 (2d Cir.1986); and *American Provision,* 44 B.R. 907 (Bankr.D.Minn.1984).

**19.** This is, of course, with the exception of the "balance of the equities" requirement. See note 18 *supra.*

**20.** There is a wealth of information on this topic. We will, however, make reference to a pair of discussions that give a brief but thorough history on the subject. *The National La-*

*bor Relations Act After 50 Years: Presidents Page,* 38 Stan.L.Rev. 931 (1986); Gould, *Some Reflections on Fifty Years of the National Labor Relations Act: The Need for Labor Board and Labor Law Reform,* 38 Stan.L.Rev. 937 (1986).

**21.** See Rosenberg, *Bankruptcy and the Collective Bargaining Agreement—A Brief Lesson in the Use of the Constitutional System of Checks and Balances,* 58 Am.Bankr.L.J. 293, 312–321 (1984).