## In re INDIANA GROCERY CO., INC., Debtor.

### Bankruptcy No. IP89–4498RA V.

United States Bankruptcy Court,
S.D. Indiana,
Indianapolis Division.

Sept. 18, 1990.

David J. Mallon, Jr., Ice Miller Donadio & Ryan, Indianapolis, Ind., for debtor.

Richard Simon, N.L.R.B., Indianapolis, Ind.

Jonathan D. Karmel, Rosenfeld & Karmel, Chicago, Ill., for Union.

James E. Carlberg, Klineman, Rose, Wolf & Wallack, Indianapolis, Ind.

## ORDER GRANTING MOTION TO REJECT COLLECTIVE BARGAINING AGREEMENT AND DENYING MOTION TO DISMISS

RICHARD W. VANDIVIER, Bankruptcy Judge.

This matter comes before the Court on the Motion for Approval of Rejection of Collective Bargaining Agreement with Local 550R, United Food & Commercial Workers' Union ("the Motion to Reject"), filed on April 27, 1990, by the Debtor, Indiana Grocery Co., Inc. ("IGC"), and on the motion to dismiss the Motion to Reject ("the Motion to Dismiss"), filed by Local 550R on May 7, 1990. A hearing was held on June 5, 1990. The Court now grants the Motion to Reject and denies the motion to dismiss on the following findings of fact and conclusions of law.

### Findings of Fact

1. IGC filed a prior Motion for Approval of Rejection of Collective Bargaining Agreement with Local 550R, United Food & Commercial Workers' Union ("the prior Motion to Reject") on October 5, 1989, a hearing on which was held on November 27 and 28, 1989. On February 5, 1990, the Court denied the motion on findings of fact which the Court now incorporates by reference, except to the extent the Court specifically modifies any finding. Those facts will be only briefly summarized here.

2. IGC filed for relief under Chapter 11 of the Bankruptcy Code on June 22, 1989, and continues operations as debtor in possession. On the same date, Allied Grocers, Inc. ("Allied") and Preston–Safeway, Inc. ("Preston–Safeway") filed for relief under Chapter 11. IGC is related through common ownership and control to Allied and Preston–Safeway. Allied is now in liquidation, while IGC and Preston–Safeway are still attempting to reorganize. United Food & Commercial Workers ("UFCW"), Local 550R ("Local 550R" or "the union") represent the employees of four IGC stores, located in Vincennes, Indiana ("Vincennes"), Terre Haute, Indiana ("Terre Haute South"), Brazil, Indiana ("Brazil"), and Danville, Illinois ("Danville"). Employees of most of IGC's other stores are represented by UFCW Local 917. Allied's major lender is Security Pacific Business Credit, Inc. ("Security Pacific"). Near the time the Debtors filed for bankruptcy relief, Security Pacific agreed to continue its financing of Allied and to extend new financing of $4.6 million to Preston–Safeway and IGC. These agreements were finalized and approved postpetition by this Court.

3. In its prior Motion to Reject, IGC contended that it must reject the CBA with Local 550R in order to cut its expenses and to retain financing from Security Pacific, which are both necessary to its reorganization. In denying the prior Motion to Reject, the Court concluded that IGC had not met its burden of proving its entitlement to reject the CBA. In particular, the Court concluded that IGC had not shown that the modifications it had proposed to Local 550R assured that all creditors, IGC and all affected parties were treated fairly and equitably, that the union refused to accept IGC's proposal without good cause, and that the balance of equities clearly favored rejection of the CBA. Because these deficiencies appeared susceptible to correction, however, the Court granted IGC leave to renew its motion after 60 days, which it has done.

4. Local 550R has moved to dismiss the Motion to Reject, alleging that IGC has "unclean hands" because it unilaterally changed the terms of the CBA by reducing wages prior to getting approval to reject the CBA. The Court finds that wage reductions at three stores were made pre-

petition, after employee votes. IGC and Local 550R dispute the results of the votes and the propriety of IGC's subsequent wage reductions, and that dispute is currently before the NLRB. IGC has made no further changes in the terms of the CBA since it filed for bankruptcy relief. The employees at Vincennes are still receiving the wage rates called for by the CBA.

5. Before turning to the new evidence, a review and update of the people involved is in order. Lowell Peters ("Peters") is chairman of the board and CEO of IGC. Daniel D. McClure ("McClure") has been president and chief operating officer of IGC for about one year. George W. Davis ("Davis"), formerly executive vice president and chief financial officer of all three Debtors, no longer works for the retail Debtors, but only for Allied. Joe Lubbehusen, formerly IGC's Director of Budgets and Control, is now its Comptroller. Alfred Pickett ("Pickett"), formerly IGC's chief labor negotiator, is now a store manager. James Cunning ("Cunning") is a labor attorney at Ice, Miller, Donadio and Ryan, who usually handles IGC's labor matters. Jim Jacobs ("Jacobs") is president of Local 550R. Jonathan D. Karmel ("Karmel") is an attorney for Local 550R. Dave Kemp ("Kemp") is Local 550R's business agent. Leslie Nulty ("Nulty") is director or UFCW's research office.

6. McClure testified that since the Court's denial of the prior Motion to Reject, IGC has negotiated with the union over proposed wage reductions. On March 21, 1990, at IGC's request, and on short notice to the union representatives, who were in Indianapolis on other business, McClure, Pickett, Jacobs, Cunning and Karmel met at the Airport Hilton in Indianapolis for a preliminary discussion of the situation. On March 23, 1990, Pickett sent Jacobs a proposal for changes in the CBA ("the March 23 proposal") and some information the union had requested.

7. On April 3, 1990, McClure, Pickett, Jacobs and Kemp met at Jacob's office in Terre Haute, and discussed several issues, including wage conversion, successor language in the CBA, individual employee matters, and the proposed overall wage reductions. They reached tentative agreement on some issues, but not on the proposed wage reductions. If there were to be any agreement reached, Jacobs wanted a three year term, with wage increases of about ten cents per hour in the last two years. McClure said IGC would not make an agreement with Local 550R that was more favorable than the one it had with Local 917. IGC told the union that in order to operate profitably, IGC would have to make an across the board 16.5 percent wage reduction. Pro formas showed that under normal circumstances (i.e. normal sales, inventory levels, etc.), IGC could break even, and possibly show a profit, with such a reduction. (IGC no longer contends that such a reduction is necessary to retain financing from Security Pacific.) The union said it thought IGC could survive without such a reduction and that the union could not sell such a reduction in Vincennes, where employees were still working under the CBA rates. McClure testified that Jacobs said he did not care if IGC made it and that the union would not suffer if it lost the four stores, but Jacobs said he simply told McClure, in response to an inquiry, that the four stores represented only five percent of the union's membership. IGC told the union that time was of the essence in resolving this matter, since Peters was attempting to arrange financing. Jacobs requested additional information, including the details of the changes that had already been implemented. Jacobs testified that McClure was supposed to get back to Jacobs within a few days, but did not contact him for about three weeks.

8. McClure testified that on April 24, 1990, he sent the union a proposal modifying some of the wages rates ("the April 24, 1990, proposal"), included additional information, and expressing willingness to continue negotiations, including discussion of a "wage re-opener" at the end of every year based on the two percent CTO provision. On April 26, 1990, McClure and Jacobs talked by phone. Jacobs believes, however, that he did not receive the information until after the phone call. McClure testified

that Jacobs said he did not see much difference between the March 23 and the April 24 proposals and would not try to sell them to the membership. They agreed they were deadlocked on the issue of wage reductions. McClure followed up the conversation with a letter dated April 26, 1990, expressing willingness to continue negotiations. On May 8, 1990, Lubbehusen sent Karmel updated financial information. Before the June 5 hearing, IGC sent Karmel the latest store reports.

9. Since the Court denied the prior Motion to Reject, IGC has made changes in its management structure and compensation. Peters' salary has been reduced from $3200.00 to $2400.00 per week. However, Allied (and possibly Preston–Safeway) contributes less to this salary, to reflect his decreasing responsibilities to Allied, while before, Allied, IGC and Preston–Safeway shared the expense more evenly. (As of mid-March, 1990, the three Debtors' management salaries are no longer paid by Preston–Safeway Management Group, Inc., to which the Debtors used to contribute, but instead are paid directly by the Debtors.) Davis left IGC in mid-May, 1990, and has not been replaced. His salary has not been reduced, but he now works for and is paid by only Allied. Davis advised Peters that he believed the retail stores would not be able to support someone with his salary requirements, and so he would look for other employment. McClure's yearly salary has been reduced by $1000.00, to $54,000.00. This is less than the $80,000 to $82,000.00 salary of his predecessor, and, according to McClure, at the low end of industry standards. McClure testified that if his salary were much lower, he would have to look for different work. In addition, McClure has responsibility for field operations, which his predecessor did not have. McClure spends about 70 percent of his time in the field. After Davis left, Lubbehusen became comptroller, with more responsibilities than before, but with no increase in salary. No treasurer has been appointed for IGC. Pickett is no longer an officer of any of the Debtors. No officers received bonuses in 1990, but some store managers may have. Davis knows of no plan to give officers bonuses in 1990, and would be very surprised if any were given.

10. Since filing, IGC has worked to negotiate credit terms with its vendors, and has been successful for the most part. Some vendors who had insisted on COD have been changed, such as IGC's dairy supplier, and some vendors have agreed to credit terms. Since Allied has gone into liquidation, Certified Grocers ("Certified") is IGC's warehouse supplier, from which it gets about 52% of its groceries. Certified has not yet agreed to credit terms, but requires prepayment. Davis testified, however, that Certified has bent on its terms and allowed carry over for a couple of days on occasion. Typical terms with a warehouse supplier would be better than this, but would not be as long as 30 or 60 days. To McClure's knowledge, IGC has not tried to negotiate forgiveness of any prepetition debt with any of its vendors. However, McClure believes that the treatment of prepetition debts owing to vendors will be subject to negotiation in putting together a plan or reorganization.

11. On filing, IGC got financing from Security Pacific for 120 days, which was then extended to February 23, 1990. It is now on a demand basis, but Security Pacific has not exercised its right to demand payment. As of the hearing date, the balance owed by IGC was a little over $2 million. There have been no negotiations to forgive any part of that loan. The Security Pacific financing is oversecured, in Davis's opinion, so there would be no reason for it to consider reducing its claim.

12. Local 917 employees are still working under the SER rates, which they earlier agreed to. If Local 550R employees get better treatment than those of Local 917, McClure believes there could be labor problems with Local 917, and it would cause administrative problems. Historically, when there has been differing treatment between the two unions, there has been unrest. Jacobs testified that if the CBA is rejected, there is a good chance that Local 550R employees would strike. There are

no more Teamster jobs at Allied since it went into liquidation.

13. McClure testified that if a 16.5 percent wage reduction is not implemented in the Local 550R stores, they would not be part of the reorganization. At three of the Local 550R stores, SER rates have been implemented for over a year, with wage reductions of up to 20 percent. The rate reductions at the Local 917 stores are at 16.5 percent, only the 550R stores would have cuts up to 20 percent. Under the March 23, 1990, proposal, wages at the Local 550R stores, except Vincennes, would not be cut any more than the SER rates already in effect, and some in fact would be raised (mostly higher rated employees). Some, however, would remain below the 16.5 percent cut. The 16.5 percent cut represents an overall reduction over the entire bargaining unit, including the Local 917 stores. Some employees took no or minimal cuts (primarily at the lowest end of the scale), while others took greater reductions.

14. According to McClure, wage reductions are one part of the formula for reorganization, along with cutting other expenses, controlling inventory "shrink", getting better credit terms and better stocking of inventory, increasing sales, and getting additional financing. Peters has been working for the past two years on the financing problem. Even with the wage cuts in effect, IGC has still been operating at a loss. Since going with Certified as its wholesaler, IGC has been able to improve its stock purchases, but sales have still been hampered because of lack of credit terms. McClure believes if IGC comes out of Chapter 11, vendors would give it normal credit terms.

15. According to McClure, there has been an improvement in the stores' CTO for the first four quarters of 1990. The gross profit margins of some stores have improved. Store contribution for the fourth period of 1990 (the latest before the hearing) was a positive $40,000, after negative numbers for the first three periods, which Davis testified was a positive trend. The year to date contribution however, was negative $245,000, and the store net profit in the fourth period was negative $73,000.

16. Davis testified that the proposed 16.5 percent labor cost reduction is necessary for successful reorganization. With a 20 percent gross profit rate, labor costs are about 10 percent, making it the largest controllable expense. Some expenses, such as depreciation, are fixed. If the labor costs for the Local 550R stores go back to the CBA rates, reorganization would probably not include those stores, and would be more difficult for the whole company.

17. Nulty analyzed the IGC store reports, which covered all stores, not just the Local 550R stores, and prepared several graphs for the fourth period of 1989 through the second period of 1990. (There are 13 periods in one year). Nulty testified that the grocery business is seasonal, with a large part of sales and profits during the last quarter of the year, due to holidays. IGC's sales, however, were flat during the last quarter of 1989. Nulty believes this raises questions about IGC's ability to generate sustained sales. One factor underlying the two percent CTO requirement in the snapback provision was the projection of a higher gross margin, but IGC's gross margins have been erratic. Nulty was also concerned that improving gross margins were not associated with increased sales, indicating there may be a problem with pricing. Since bankruptcy, IGC's net losses have been less than before, but IGC has showed profits in only two periods. In analyzing store contribution as percent of sales, Nulty determined that the two percent necessary to activate the snap back provision was attained in only two periods since bankruptcy. Nulty noted that even though there was a positive store contribution in the fourth period of 1990, administrative charges increased and there was still a net store loss. Nulty opined that IGC would continue to show losses and little improvement in sales, which are critical to reorganization.

18. Nulty noted that expenses other than hourly wages and benefits had not decreased, and may have increased slightly, since bankruptcy. Expenses other than

hourly wages and benefits as a percent of sales has been fairly constant since bankruptcy. Hourly payroll and benefits dropped sharply between June and July 1989, when wage cuts were implemented, and continued downward through the end of the year, with an increase in January and February 1990. As a percent of sales, hourly payroll and benefits fell through the end of 1989. Nulty concluded that hourly labor was bearing the brunt of IGC's cost cutting. Nulty did not ask IGC for explanations for any of the questions the store reports raised and did not attempt to determine which stores were operating during any given period.

19. With respect to Nulty's analysis, Davis testified that inventory adjustments, or "shrink", do not necessarily reflect what happened in the period in which they appear, but may be due to occurrences anytime between inventories. This accounts for some of the fluctuations in gross margin in late 1989 and early 1990. Taken as a whole, there may be a reduction in gross margin, but during that time, Allied was still IGC's supplier, which caused stock shortages in important items. The problems with stocking through Allied impacted IGC's net profit in the last periods of 1989. Davis testified that the two percent CTO in the snap back provision did not contemplate sales levels during the bankruptcy, but during normal operations anticipated after emerging from bankruptcy.

20. As far as hourly payroll and benefits, Davis explained that the reductions since bankruptcy were caused in part by store closings. In the first period of 1990, unemployment compensation contributions increase the hourly worker expense, a factor which Nulty also noted. Reductions in the 10th, 11th and 13th periods of 1989, resulted in part from IGC's adjustment over those periods of an overaccrual of expenses for vacation and medical expenses. Nulty had not been informed of the overaccrual until the date of the hearing, when she listened to Davis's testimony, and expressed concern that the SER requested was based on labor expenses that were inflated by these overaccruals.

21. The Court finds the witnesses and evidence presented to be generally credible. The Court will resolve material factual disputes and make additional findings of fact in discussion of applicable law below.

### Conclusions of Law

This Court has jurisdiction over this matter. 28 U.S.C. section 157(b)(2)(A); *In re Texas Sheet Metals, Inc.*, 90 B.R. 260, 263 (Bankr.S.D.Tex.1988).

The Court now incorporates by reference the conclusions of law it made in its February 5, 1990 order ("the prior order"), except to the extent specifically modified below, and makes additional or expanded conclusions as necessary.

■ An attempt by a debtor in possession ("DIP") to reject a CBA is governed by 11 U.S.C. section 1113. The parties agree, and the Court concurs, that in order to reject a collective bargaining agreement under that provision, a DIP must satisfy nine requirements, *see In re Big Sky Transportation Co.*, 104 B.R. 333, 335 (Bankr.D.Mont.1989), *In re American Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn. 1984), which will be set forth as part of the discussion of each below. Though a union may have the burden of production on some of the requirements, the DIP has the burden of persuasion by a preponderance of the evidence on all nine requirements. *See id.*

■ *Requirement 1: The DIP must have made a proposal to the union to modify the CBA.* Local 550R contends that IGC has not made a legitimate proposal for modification, but has, at least with respect to Danville, Brazil and Terre Haute South, presented a "done deal". The union asserts this is cause for dismissing the Motion to Reject. The Court, however, previously concluded that IGC has indeed proposed a contract modification, and the additional evidence before the Court does not alter this conclusion. The modifications made prepetition are the subject of an NLRB unfair labor practice action, over which this Court has no jurisdiction, *see In re Carib–Inn of San Juan Corp.*, 905 F.2d

561 (1st Cir.1990), and on which the Court expresses no opinion. If the union prevails in that action, it may assert a claim against IGC. The modifications may be found to have been an unfair labor practice, but they cannot be violations of section 1113, since prior to filing for relief in bankruptcy, that section had no application to IGC's actions. On filing, IGC became a DIP, an entity different, for many purposes, than it was prepetition. IGC, as DIP, has made no unilateral changes in the CBA, but has made a proposal to the union to modify the terms of the CBA, as the union contends them to be. The Court therefore finds that IGC has satisfied Requirement 1 and that Local 550R's Motion to Dismiss should be denied.

■ *Requirement 2: The proposal must have been based on the most complete and reliable information available.* Local 550R asserts that the projections on which IGC based its wage reduction proposals are unreliable, and faults IGC for not taking into account the overaccruals of vacation and medical expenses, revealed for the first time at the June 5 hearing. The evidence indicates that the excessive accruals were inadvertent and not deliberately concealed from the union, and that they were not of a sufficient magnitude to significantly change the figures on which IGC made its proposals. Though projections based on the same set of historical facts may differ, the Court believes that IGC based its proposals on the best historical data and projections it could produce at the time of each proposal. The Court concludes that IGC has shown that it used the most complete and reliable information and the best analysis it had available in formulating its proposals.

■ *Requirement 3: The proposal must "provide[ ] for those necessary modifications in the employees [sic] benefits and protections that are necessary to permit reorganization of the debtor...."* 11 U.S.C. section 1113(b)(1)(A). In its prior opinion, the Court concluded that the DIP satisfies this requirement when its proposal contains necessary, though not absolutely minimal, changes that will enable it to suc-

cessfully complete reorganization. *See Truck Drivers Local 807, International Brotherhood of Teamsters, v. Carey Transportation Inc.,* 816 F.2d 82, 90 (2nd Cir.1987). The issue, therefore, is whether the modifications of IGC's March 23, 1990, proposal, as modified on April 24, 1990, even if not the bare minimum to avoid immediate liquidation, were necessary to enable IGC to successfully complete reorganization. IGC would satisfy this requirement if its evidence shows that its proposed modifications are necessary to enable it to successfully complete reorganization.

Everyone agrees that IGC faces serious financial problems. As the Court noted in its prior opinion, even if IGC's problems were not caused by high labor costs, but by low sales, labor costs must sometimes be reduced for successful reorganization even if they are not to blame for the debtor's plight. *See Big Sky Transportation,* 104 B.R. at 338. IGC's probability of successful reorganization will be enhanced if it both increases sales and reduces expenses, including labor costs, at each store and company wide. Without the SER concessions, the four Local 550R stores cannot operate profitably. IGC cannot afford to keep stores open that are not individually profitable, yet each store closing increases the overhead burden the remaining stores must carry, decreases IGC's buying base, and decreases IGC's chance for successful reorganization. Although IGC is still operating at a loss, it appears to have a chance of operating profitably after emerging from reorganization if it can reduce costs and resume "normal" operations, i.e. with credit terms from suppliers, normal inventory levels and adequate financing. Reducing costs, including labor costs, is an essential element of this chance for success.

The Court concludes that IGC has made substantial efforts to reduce other expenses, including compensation for top management, which will be discussed in detail under requirement 4, to improve its inventory and to negotiate adequate financing. The March 23, 1990, proposal contains a snap-back provision. No evidence was adduced to alter this Court's prior opinion

on this issue and the Court's prior discussion on this point stands.

The Court finds that IGC has met its burden of showing that the proposed modifications are a necessary part of IGC's cost savings effort, which is necessary to enable it to complete reorganization successfully.

■ *Requirement 4: The proposed modifications must assure that creditors, the DIP and all affected parties are treated fairly and equitably.* In its prior opinion, the Court concluded that IGC had failed to prove that top management and creditors were bearing an equitable burden in IGC's reorganization, and thus, that all affected parties were being treated fairly and equitably. Local 550R contends this is still the case in that the wages of some Local 550R employees would be cut more than any Local 917 employee's, management compensation has still not been reduced enough, and IGC's creditors are still not bearing their share of the burden of reorganization.

The Court concluded in its prior opinion that a debtor is not required in all cases to show that managers and employees represented by other unions will have their benefits cut by the same degree that the benefits of workers covered by the CBA sought to be rejected are cut. *See Carey,* 816 F.2d at 90; *Texas Sheet Metals,* 90 B.R. at 269. Equity under section 1113 means fairness under the circumstances, not a dollar for dollar comparison. *See In re Walway Company,* 69 B.R. 967, 974 (Bankr. E.D.Mich.1987). Although under the March 23/April 24 proposal, some Local 550R employees wages would be reduced by up to 20 percent, and no Local 917 employee's wages were reduced by more than 16.5 percent, the uncontroverted evidence is that the goal (and the effect, if implemented) of the proposed cuts is an overall 16.5 percent wages reduction with members of both locals being paid the same rates for the same work. The Court finds this to be fair and equitable treatment of the members of both locals.

■ In its prior opinion, the Court found troubling the absence of compensation reductions for top management and the absence of specifics to support IGC's general assertions that on this issue. Since that time, as is apparent from the above findings of fact, there have been substantial changes in this area, and IGC has provided better evidence to support its assertions. McClure's salary is substantially below that of his predecessor and is at the low end of the industry, and he has field responsibilities his predecessor did not. If his salary were much lower, he would look for other employment. Some management positions have been left unfilled. Peters' salary has been reduced by about 25 percent. No bonuses for top management have been paid for 1990 and none are expected.

Although in its prior opinion the Court found the three Debtors' affairs to be closely related, this is no longer so much the case since Allied is in liquidation. Allied's only business now is winding down. It is no longer IGC's wholesaler. Top management of the Debtors is no longer paid through a separate corporation to which all the Debtors contribute, but management is paid directly by each Debtor for the services performed for each Debtor. Davis no longer works for IGC, and will be leaving Allied once it is liquidated, if not sooner. Davis will not benefit financially from IGC's successful reorganization. The Court therefore will not count it against IGC that Allied has not reduced Davis's salary.

■ In its prior opinion, the Court stated that while it would probably be an unreasonable burden for a debtor to have to get and prove burden sharing by every one of its creditors, a debtor should show that major creditors who stand to benefit greatly from successful reorganization and from concessions employees make are bearing in some manner their fair share of the burden of reorganization. The Court found IGC's prior evidence lacking on this point. As the Court noted before, the interests of unsecured creditors, secured creditors, priority creditors and creditors with claims resulting from rejection of an executory contract (such as Local 550R members would have) have differing rights under a

reorganization, *see e.g.* 11 U.S.C. section 1129(a)(7), (b)(2), and creditors and employees play different roles in reorganization. Comparing the specific burdens assumed by these differing parties is like comparing apples to oranges. The Court is left with only the general guidance that equity means fairness under the circumstances. *See In re Walway Company*, 69 B.R. at 974.

IGC presented additional evidence on the role IGC's creditors are playing in reorganization efforts, in particular, showing that certain vendors are extending credit terms to IGC and Security Pacific has refrained from exercising its right to demand immediate payment of its claim. The vendors with unsecured prepetition claims will likely recover only a fraction of their claims paid under a plan of reorganization. (The Court notes that the plan submitted by Peters would pay a dividend of about 12 percent. *See* Disclosure Statement filed July 12, 1990.) Security Pacific, with a blanket security interest in IGC's assets, is bearing the risk that its collateral will depreciate while it forebears foreclosure. The Court now concludes that IGC has presented sufficient evidence that its creditors are bearing an equitable part of the burden of its reorganization.

Upon the new evidence IGC presented, the Court concludes that the proposed modification would assure that all affected parties would be treated fairly and equitably.

■ *Requirement 5: The DIP must have provided the Union with such relevant information as is necessary to evaluate the proposal.* In its prior opinion, the Court concluded that IGC made its best effort to provide the information requested by Nulty and other representatives of Local 550R. The union now argues that IGC's failure to provide it with the data on excessive accruals of vacation and medical benefits is a fatal defect. However, from the figures in the store reports and the graphs prepared by Nulty, it appears that although the accruals may have been large enough to cause a bit of a dip in labor costs during the periods when corrections were made, they were not great enough to have made a significant difference in the IGC's overall financial condition at the time the proposals were made. The Court concludes that IGC provided Local 550R with the necessary relevant information to enable it to evaluate the proposals.

*Requirement 6: The DIP must have met at reasonable times with the union.* Although the union finds fault with the rather impromptu manner of the March 21, 1990, meeting, the Court concludes that IGC has borne its burden of proving that it met at reasonable times with Local 550R representative to discuss the proposed modifications.

■ *Requirement 7: At the meetings, the DIP must confer in good faith in attempting to reach mutually satisfactory modifications to the CBA.* Local 550R argues that IGC's prepetition implementation of SER and its nondisclosure of the overaccruals of vacation and medical benefits show that IGC was not bargaining in good faith. The Court has already discussed these matters above and concludes that they are not bases for finding a lack of good faith in conferring about the proposed modification.

IGC contends that IGC took a "take it or leave it" position with respect to the union's request for a three year agreement and ten cent per year wage increases. However, IGC gave the union its reason for being unable to comply with this request, i.e. its fear of labor unrest with Local 917, and expressed willingness to negotiate a "wage re-opener" at the end of every year as an alternative. The union declined to negotiate alternatives and agreed the parties were deadlocked. The Court concludes that IGC has negotiated the proposed modifications in good faith.

■ *Requirement 8: The union must have refused to accept the proposal without good cause.* In its prior opinion, the Court found that Local 550R rejected the July 14 proposal because it had concluded that IGC could not survive even with the reductions, and its members would be better off retaining their claims to the CBA rates, which they could arguably assert as

an administrative claim if they prevailed in the NLRB action (or in the case of the Vincennes employees, which they would receive until IGC's demise). The evidence convinces the Court that the union rejected the March 23/April 24 proposal for the same reasons. Though this stance might indeed benefit Local 550R employees more than wage concessions if IGC is indeed doomed to fail, this purely selfish concern cannot be good cause for refusing to cooperate with a debtor's good faith efforts to reorganize. *Cf. In re Salt Creek Freightways,* 47 B.R. 835, 840–41 (Bankr.D.Wyo. 1985) (union's policy not to negotiate away from national master agreement understandable, but not good cause for rejecting proposal).

**Requirement 9:** *The balance of the equities must clearly favor rejection of the CBA.* This requirement of section 1113 codifies the equitable test set forth in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), in which the Supreme Court directed that a bankruptcy court balance the interests of the debtor, creditors and employees, considering the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of creditors' claims if the CBA were affirmed, the impact on rejection on the employees, and the degree and quality of the hardship each may face. *See id,* 104 S.Ct. at 1197.

In its prior opinion, the Court found that rejection of the CBA so that IGC can implement uncontested SER in all Local 550R stores would enhance its chance for successful reorganization. If the CBA is not rejected, it is likely that the Local 550R stores will be closed, even if IGC is not forced into liquidation, putting those employees out of work. Rejection of the CBA would result in lower wages for employees whose wages are already modest, but if the CBA is not rejected, those employees will likely soon lose their jobs. Creditors, employees and IGC will clearly be better off if IGC reorganizes as a going concern rather than liquidates. Rejection of the CBA would entitle the Local 550R employees to file a claim for breach of contract, presum-

ably for the difference between what they would have received under the CBA and what IGC will actually pay after rejection, which would be treated as a prepetition claim. *See* 11 U.S.C. section 365(g)(1). Assuming this would be a general unsecured claim, it would have a less detrimental effect on IGC's ability to formulate a plan of reorganization and on other creditors' distribution than would the claim in like amount that could result from the NLRB action, which Local 550R could arguably assert as an administrative claim with priority over general unsecured claims. *See* 11 U.S.C. sections 1129(a)(7)(A), 726(a)(1), 507(a)(1) and 503(b)(1)(A).

Although these concerns militated in favor of allowing rejection of the CBA, the Court could not find that the equities *clearly* favored rejection because IGC had failed to show that its top management and its creditors were shouldering a fair share of the burden of reorganization. IGC has now made this showing, and the Court concludes that IGC has satisfied this requirement.

*Conclusion.* The Court concludes that IGC has satisfied its burden under section 1113 that it is entitled to reject its CBA with Local 550R.

Judgment on this order will be entered separately.